**BEER NUTS, INC., Plaintiff,**

v.

**CLOVER CLUB FOODS COMPANY, Defendant.**

No. NC 79–82J.

United States District Court, D. Utah, C.D.

March 12, 1985.

Robert Mallinckrodt, Salt Lake City, Utah, Robert M. Newbury, Chicago, Ill., for plaintiff.

R. William Johnston, Pasadena, Cal., for defendant.

## MEMORANDUM OPINION

JENKINS, Chief Judge.

This is an action for trademark infringement under the Lanham Act, 15 U.S.C. § 1114 (1976). Beer Nuts, Inc., asserts that the defendant Clover Club Food Company's use of the term BREW NUTS and a drawing of an overflowing stein on a package of sweetened and salted peanuts infringes the plaintiff's registered trademark BEER NUTS®. After a trial on the merits, this court ruled that because there was no likelihood of confusion concerning the origin of the competing products, Clover Club had not infringed Beer Nuts' trademark. *Beer Nuts, Inc. v. Clover Club Foods Co.,* 520 F.Supp. 395 (D. Utah 1981). The United States Court of Appeals for the Tenth Circuit, after concluding that this court based its decision "solely on a side-by-side comparison of the Beer Nuts and Brew Nuts packages," reversed and remanded. *Beer Nuts, Inc., v. Clover Club Foods Co.,* 711 F.2d 934, 941 (10th Cir. 1983).

On January 13, 1984, the court heard oral arguments on remand. Robert Mallinckrodt and Robert M. Newbury appeared for the plaintiff Beer Nuts. R. William Johnston appeared for the defendant, Clover Club. At that time, the court took the matter under advisement. After due consideration of the oral arguments, the memoranda filed by the parties, and the transcript of the trial, the court now enters this memorandum opinion in accordance with the instructions of the Court of Appeals.

## I. LIKELIHOOD OF CONFUSION

Each of the parties markets sweetened and salted peanuts. Beer Nuts asserts that Clover Club's BREW NUTS package infringes Beer Nuts' trademark in violation of section 32(1) of the Lanham Act. That section provides in pertinent part as follows:

> Any person who shall, without the consent of the registrant—
>
> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive ...
>
> shall be liable in a civil action by the registrant.

15 U.S.C. § 1114(1).

■ It is undisputed that Beer Nuts, Inc., has registered the trademark BEER NUTS®.[1] It is also undisputed that Clover Club has used in commerce the words "Brew Nuts" in connection with the sale of its salted, sweetened peanuts.[2] Beer Nuts does not contend that the BREW NUTS package is a copy or a counterfeit of the BEER NUTS® trademark. Thus, the sole issue on remand is whether Clover Club's use of the words "Brew Nuts" in conjunction with a picture of an overflowing stein "is likely to cause confusion in the marketplace concerning the source of the different products." *Beer Nuts,* 711 F.2d at 940.[3]

The courts have recognized two separate categories of confusion concerning the

---

1. In a counterclaim, Clover Club originally sought cancellation of Beer Nuts' trademark. Clover Club has dropped that contention on remand.

2. The Tenth Circuit held "as a matter of law that Clover Club has deliberately used 'Brew Nuts' as a trademark." *Beer Nuts,* 711 F.2d at 938.

3. There is also a question of whether the BREW NUTS package is a colorable imitation of the BEER NUTS® trademark. However, that question is implicit in the question of likelihood of confusion.

source of products. One is that the defendant's mark will confuse the public about the source of the defendant's product—that it will mislead the public into believing that the defendant's product is produced by or is related to the plaintiff. The second category, known as reverse confusion, is that the defendant's mark will confuse the public about the source of the plaintiff's product—that it will mislead the public into believing that the plaintiff's product is produced by or is related to the defendant. *Big O Tire Dealers v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365 (10th Cir.1977). Beer Nuts does not claim that Clover Club has caused reverse confusion. Therefore, squarely presented, the only issue before this court on remand is whether Clover Club's packaging is likely to create confusion in the marketplace concerning the source of Clover Club's product, BREW NUTS.

■ In resolving this issue,[4] the court has examined numerous factors, including those listed in Restatement of Torts § 729 (1938):

  (a) the degree of similarity between the designation and the trade-mark or trade name in
    (i) appearance;
    (ii) pronunciation of the words used;
    (iii) verbal translation of the pictures or designs involved;
    (iv) suggestion;
  (b) the intent of the actor in adopting the designation;
  (c) the relation in use and manner of marketing between the goods or services marketed by the actor and those marketed by the other;
  (d) the degree of care likely to be exercised by purchasers.

**4.** The plaintiffs assert that the Tenth Circuit's opinion has disposed of several of the questions of fact now before the court. The Court of Appeals stated the contrary:

  Although we offer no opinion regarding the merits of this case, we remand for a proper evaluation of similarity and a reconsideration of the likelihood of confusion under the correct legal standards and the evidence presented.

*See Beer Nuts*, 711 F.2d at 940. The court has considered these factors both individually and as a whole; "no one factor is determinative." *Id.*

### A. Similarity.

■ The first factor the court has considered is "the degree of similarity between the designation and the trademark ... in (i) appearance; (ii) pronunciation of the words used; (iii) verbal translation of the pictures ... involved; [and] (iv) suggestion." Restatement § 729. The court has considered the similarity of the marks "in light of what occurs in the marketplace, not in the courtroom." *James Burrough Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d, 266, 275 (7th Cir.1976).

BREW NUTS is sold in drug stores, convenience stores, supermarkets, gas stations, vending machines, taverns, and liquor stores. The package is presented to consumers on racks, on shelves, or in bins. In any case, the package is visible to the public so that a potential buyer can examine the information given on at least the front of the package and decide whether to purchase the product without first touching the package.

■ Occasionally, both BREW NUTS and BEER NUTS® are marketed side-by-side.[5] However, because that is not always the case, the court must determine whether the Brew Nuts package creates a probability that a potential purchaser will be confused concerning the source of BREW NUTS "when singly presented." *Beer Nuts*, 711 F.2d at 941.

The court has examined the probability of confusion with regard to four groups of potential purchasers: those who have not heard of either BEER NUTS® or BREW

711 F.2d at 942.

**5.** If BEER NUTS® and BREW NUTS were always marketed side-by-side, side-by-side comparison of the two packages would be entirely appropriate. In that case, the two packages are so radically different that not even a careless consumer would have reason to believe that Beer Nuts, Inc., produces BREW NUTS.

NUTS, those who are aware of both BEER NUTS® and BREW NUTS, those who have heard of BREW NUTS but not BEER NUTS®, and those who have heard of BEER NUTS® but not BREW NUTS. The only group of potential customers that face the potential of confusion over the source of BREW NUTS is the group that has heard of BEER NUTS® but not BREW NUTS. Those who know nothing about BEER NUTS cannot be confused into believing that BREW NUTS comes from Beer Nuts, Inc. In addition, those who are familiar with both will not be confused because they would recognize that the two products come from different sources.

### 1. Similarity in Appearance.

In order to make a finding regarding "the degree of similarity between the designation and the trademark ... in appearance," the court must make a comparison. Conceptually, it is impossible to make a comparison in a vacuum; the court must compare the BREW NUTS package with something. Comparing the BREW NUTS package with the BEER NUTS® package is the most obvious comparison, but the Tenth Circuit has now ruled that such a comparison, if that is all that is done, is inappropriate.

■ The Court of Appeals seems to have directed this court to compare the BREW NUTS package with a hypothetical customer's mental picture of BEER NUTS®.[6] First, the court must determine what a hypothetical prospective purchaser's mental picture of BEER NUTS® would be. Second, the court must compare that picture with the BREW NUTS package to determine whether that same hypothetical prospective purchaser would be confused about the source of Clover Club's BREW NUTS.

*a. A hypothetical prospective purchaser's mental picture of BEER NUTS®.* In making a finding about what a hypothetical prospective purchaser may remember about BEER NUTS®, the court must make some assumptions about that prospective purchaser. It is clear that not every prospective purchaser of BEER NUTS® will have the same mental picture of BEER NUTS®. Some will have perfect recall of the entire package. Others will recall only that the BEER NUTS® package is printed in red ink with block letters that spell "BEER NUTS." Still others may remember nothing more than the name "Beer Nuts."

■ The group of prospective purchasers most likely to be confused about the origin of BREW NUTS is the group with the least amount of recall about BEER NUTS®. The court must be concerned with the possibility of confusion if an *"appreciable number* of purchasers are likely to be misled." Restatement § 728, comment a (emphasis added). It follows that in deciding which mental picture to compare with the BREW NUTS package, the court should select the mental picture of the group of purchasers having the least amount of recall so long as that group contains an appreciable number of purchasers.

In this case, the court assumes, without deciding, that an appreciable number of people would recall only the name "Beer Nuts." Therefore, for the purpose of determining whether the BREW NUTS package creates a probability that a hypothetical prospective customer will be confused about the origin of BREW NUTS, the court assumes, as the Court of Appeals did,[7] that the prospective purchaser has heard of BEER NUTS® and knows the name but

**6.** In discussing the inappropriateness of a side-by-side comparison, the Court of Appeals stated as follows:

A prospective purchaser does not ordinarily carry a sample or specimen of the article *he knows well enough to call by its trade name,* he necessarily depends upon the mental picture of that which symbolizes origin and ownership of the thing desired.

*Beer Nuts,* 711 F.2d at 941, quoting *Avrick v. Rockmont Envelope Co.,* 155 F.2d 568, 573 (10th Cir.1946) (emphasis added).

**7.** *See* footnote 6.

either has never seen the BEER NUTS® package or cannot recall what it looks like.

*b. Comparing the hypothetical prospective purchaser's mental picture of BEER NUTS® with the BREW NUTS package.* The court must next compare the words "Beer Nuts" with the BREW NUTS package. Initially, the court notes that the words "Beer Nuts" are not created, original, and arbitrary words such as the word "Kodak." The words were taken from the common pool of language and used as a mark. As a mark, they have acquired a secondary meaning relating to the origin of the product, honey sweetened, salted peanuts.

■ It is naive to suggest that the words "Beer Nuts" function only as a trademark. They do mark origin, but they also describe the product. Their function is much like a coaxial cable: They carry more than one message. One message is origin. A second, identity. A third message is an appropriate use of the product—BEER NUTS® may be propitiously consumed with beer. The Lanham Act does not grant Beer Nuts a monopoly on all of those messages. Competitors are free to suggest to the public that their nuts, like BEER NUTS®, are good with beer. The Lanham Act does not prohibit a competitor from making that suggestion in a trademark, so long as that trademark does not create a likelihood of confusion about the source of its nuts. The Lanham Act is a shield intended to prevent competitors from usurping the trademark owner's reputation. Beer Nuts seeks to use it as a sword to prevent Clover Club from identifying its product, through a trademark, with the principal use of that product. This court is unwilling to grant such broad and expansive protection not intended by the Lanham Act.

■ Like the BEER NUTS® trademark, the BREW NUTS mark conveys more than one message: One is to mark origin; another, to suggest a use of the product. However, the court does not hold that Clo-

ver Club has established a fair use defense. *See Beer Nuts* 711 F.2d at 937–38. Rather, the court holds that a trademark, such as BEER NUTS®, that uses words from the common reservoir of language and that describes the principal use of the product it represents, is not entitled to the same degree of protection to which a trademark that uses an arbitrary, fanciful word or that does not describe the principal use of the product is entitled. *Cf.,* 2 J. McCarthy, Trademarks and Unfair Competition § 23:15 (1973). Otherwise, the trademark owner whose trademark both identifies origin and describes the principal use of the product would be at a competitive advantage not intended by the Lanham Act. He would be the only competitor entitled to describe as well as to identify.

In so holding, the court recognizes that Clover Club nevertheless is not entitled to use a trademark to create confusion about the source of its product. The court has compared the words "Beer Nuts" with the appearance of the BREW NUTS package and concludes that the BREW NUTS package is not likely to cause a hypothetical prospective customer to believe that BREW NUTS originates from Beer Nuts, Inc., or from some other, anonymous source other than Clover Club.

First, the words "Brew Nuts" do not look like the words "Beer Nuts." A prospective purchaser who sees the BREW NUTS package will not misread the words "Brew Nuts" and subconsciously see the words "Beer Nuts."

Second, the word "brew" is broader than the word "beer." Depending on context, "beer" may be encompassed by "brew." But the connotation for "beer" is very different from the connotation for "brew," although the denotation may be the same.

Third, the Clover Club® trademark—the words "Clover Club" over a four leaf clover—appears predominately on the front of the BREW NUTS package.[8] The BREW

---

8. Although the Tenth Circuit found that Clover Club used the words "Brew Nuts" as a trademark, *Beer Nuts,* 711 F.2d at 937–38, this court

does not merely compare the BREW NUTS trademark with the BEER NUTS® trademark. The court has compared the entire BREW NUTS

NUTS package cannot confuse a hypothetical prospective purchaser about the origin of BREW NUTS because the origin is clearly and predominately displayed on the package. Upon seeing the BREW NUTS package, a consumer who exercises even slight care in his or her purchase will recognize without confusion that BREW NUTS come from Clover Club and not from Beer Nuts or from some other, anonymous source.

■ Accordingly, the court finds that the BREW NUTS package is not so similar to the trademark BEER NUTS® as to create a likelihood of confusion about the source of Clover Club's nuts. This finding is based on both a comparison of the individual features of the BREW NUTS package with the words "Beer Nuts," and on a comparison of the total effect of the BREW NUTS package with the words "Beer Nuts."

The court recognizes that this finding rests in part on its assumptions regarding the hypothetical purchaser. In hypothecating about the nature of "customers," the court must deal with assumed customers with assumed characteristics and assumed levels of knowledge. None of those characteristics are in the record. Candor demands that the court acknowledge as much. The packages are before the court; the hypothetical customer is not. The court has the benefit of the record; the hypothetical customer does not. The court would be neglectful if it failed to examine the record or failed to examine the packages and in the process note characteristics, context, color, position, design, and language as used by competing vendors selling competing products. The hypothetical customer is denied that opportunity. The court simply assumes that the hypothetical customer sees only one package and has a residue of memory about the other.

The plaintiff asserts that the BEER NUTS® trademark and the BREW NUTS

package, including the Clover Club® trademark, with the words "Beer Nuts" to determine whether the BREW NUTS package creates a

package are so similar that a hypothetical customer is likely to be misled by Clover Club's package. The court disagrees. The plaintiff's position assumes that the hypothetical customer will ignore the well known Clover Club® trademark, will ignore the expansive nature of the word "brew," will translate the picture of the stein into the word "beer," will equate the word "brew" with the word "beer," and then will probably believe that the product comes from the plaintiff. This court is not prepared to assume that much, fully recognizing that others may find it perfectly reasonable to find a likelihood of confusion if they make different assumptions about the hypothetical prospective purchaser.

*2. Similarity in Pronunciation.*

The words "Brew Nuts" and "Beer Nuts" are not similar in pronunciation. Aside from the common word "nuts," the two word pairs are not phonetically similar. Clover Club's use of the words "Brew Nuts" does not create a likelihood of confusion about the origin of BREW NUTS.

*3. Similarity in Verbal Translation of the Picture Involved.*

One of Beer Nuts' principal contentions is that Clover Club's use of an overflowing stein on its package creates a likelihood of confusion about BREW NUTS' origin. Beer Nuts does not object that Clover Club's stein is similar to Beer Nuts' stein because Beer Nuts does not use a stein in its packaging or advertising. Rather, Beer Nuts argues that the verbal translation of the picture creates the confusion.

Obviously, the picture has no sound. If one translates the picture into the word "stein," or "cask," or "mug," or "cup," and compares it with the words "Beer Nuts," one cannot help but note that the appearance, sound, and meaning are different. Beer Nuts argues that it is not the stein that is objectionable, but what is inside the

probability that the public will be confused about the origin of the BREW NUTS.

stein, assuming that one knows what is inside. Even if the court assumes that beer is inside the stein, rather than some other brew, such as root beer or even coffee, the verbal translation of the picture at plaintiff's best is "beer," or perhaps "beer stein"—not "Beer Nuts."

Clover Club is not precluded from using language to suggest to its customers that its honey coated nuts are good with beer, so long as the suggestion does not create a likelihood of confusion about the origin of those nuts. Similarly, Clover Club is not precluded from using a picture to make the same suggestion. The court finds that the picture of an overflowing stein has two functions: one is to mark origin;[9] the other, to suggest that Clover Club's nuts are good with beverages, including beer. In marking origin, there is nothing about the stein that suggests the nuts come from Beer Nuts, Inc., or from any source other than Clover Club. The picture does not create a probability that prospective customers will be confused about the origin of Clover Club's nuts.

### 4. Similarity in Suggestion.

In explaining similarity in suggestion, comment e of section 729 of the Restatement notes that "Some trade-marks may be remembered best by the suggestions they make to prospective purchasers. Similarity in suggestion, as, for example, between 'Uneeda' and 'Uwanta,' is a factor to be considered." Although the trademark and packaging of both Beer Nuts' and Clover Club's products suggest a similar use of the two brands of nuts, similarity of suggested *use* does not create a likelihood of confusion of origin.

Based on an analysis of the degree of similarity between the BREW NUTS package and the words "Beer Nuts" in appearance, pronunciation, verbal translation of the stein, and suggestion, the court finds that the BREW NUTS package does not create a likelihood of confusion about the source of BREW NUTS. The court reaches this finding by analyzing each of the elements individually as well as by analyzing the collective effect of these elements.

### B. Clover Club's Intent in Adopting the BREW NUTS Packaging.

Intent to infringe is not an element of a trademark infringement case. However, "[i]ntent on the part of the alleged infringer to pass off its goods as the product of another raises an inference of likelihood of confusion." *Beer Nuts*, 711 F.2d at 941, quoting *Squirtco v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir.1980).

Beer Nuts presented no direct evidence that Clover Club intended to pass BREW NUTS off as the product of another and thus derive benefit from another's reputation. Instead, Beer Nuts argues that because Clover Club was aware of Beer Nuts' trademark and packaging, and because Clover Club adopted packaging that, according to Beer Nuts, is confusingly similar to Beer Nuts' trademark, it follows that Clover Club must have intended to pass BREW NUTS off as the product of Beer Nuts.[10] The court has rejected the premise to Beer Nuts argument—that the BREW NUTS packaging is deceptively similar to the BEER NUTS® trademark. Accordingly, Clover Club's use of the BREW NUTS packaging does not justify an inference that Clover Club intended to confuse the public.

---

**9.** The Court of Appeals held as a matter of law that "Clover Club used the words 'Brew Nuts' in conjunction with an overflowing stein as a trademark." *Beer Nuts* 711 F.2d at 938.

**10.** Essentially, Beer Nuts asks this court to draw a double inference. First, Beer Nuts claims that confusing similarity of packaging warrants an inference of intent to pass one's goods off as the product of another. Second, Beer Nuts argues that such intent warrants an inference of likeli-

hood of confusion. By asking for this double inference, Beer Nuts seeks to benefit from similarities between the BREW NUTS package and the BEER NUTS® trademark under the rubric of intent. The court has already compared the BREW NUTS package with the BEER NUTS® trademark. Drawing an inference of intent from similarities would add nothing more to that analysis.

The evidence on intent is all to the contrary: Clover Club had no intent to create confusion. Company officials were aware of Beer Nuts' mark and instructed the company's advertising agency to avoid similarity in packaging. Transcript at 372. Company officers also testified that the reason they began to market BREW NUTS was to compete with Frito Lay. Clover Club believed that in order to compete with Frito Lay, its principal competitor, it would have to market every snack food item that Frito Lay marketed. Because Frito Lay marketed a sweetened, salted peanut, Clover Club believed it had to as well. It would have been inconsistent with this marketing philosophy for Clover Club to try to confuse the public into believing that BREW NUTS are not Clover Club's product. *See* Transcript at 373–76.

Clover Club did intend to market a product very similar to BEER NUTS®. Clover Club also intended to market that product in packages that suggest what company officials believed to be the best use of that product—consumption with beverages, including beer. Beer Nuts argues repeatedly that Clover Club's choice of the words "Brew Nuts" over the alternative suggested by its ad agency, "Ah Nuts," is evidence of intent to create confusion. The court disagrees. Clover Club's decision to market its nuts as BREW NUTS rather than Ah Nuts was based on Clover Club's belief that BREW NUTS was a better mark than Ah Nuts would be. Transcript at 239. The court is unwilling to infer from that decision that Clover Club intended to pass its nuts off as the product of a competitor.

■ Accordingly, the court finds that Clover Club had no intent to create confusion concerning the source of its product. Intent is relevant in the court's analysis only because it may raise an inference of likelihood of confusion. Lack of intent to create confusion is a neutral factor.

### C. The Relation in Use and Manner of Marketing.

■ The parties agree that BREW NUTS and BEER NUTS® are used for similar purposes. The parties also agree that Clover Club and Beer Nuts market the two products similarly. Accordingly, less similarity between the BREW NUTS package and the BEER NUTS® trademark may lead to a likelihood of confusion than when the goods themselves are different or when the goods themselves are marketed differently. The court recognizes that "[t]he possibility of confusion is greatest when products reach the public by the same retail outlets," *Beer Nuts*, at 941, and that " [c]onfusing similarity is most likely when the products are themselves very similar." *Id.*

### D. The Degree of Care Likely To Be Exercised by Purchasers.

■ The final factor that the Tenth Circuit has designated as important in the analysis is "the degree of care with which the public will choose the products in the marketplace." *Id.* The Tenth Circuit has also noted that "[t]he test is whether the similitude in the labels would probably deceive a purchaser who exercises ordinary prudence, not the careless buyer who makes no examination." *Ph. Schneider Brewing Co. v. Century Distilling Co.*, 107 F.2d 699, 704 (10th Cir.1939); *see also Dawn Donut Co. v. Day*, 450 F.2d 332, 333 (10th Cir.1971).

The evidence on the degree of care likely to be exercised by purchasers is sparse. First, the president of Clover Club testified that he would classify BREW NUTS as an impulse item. Transcript at 250. He explained that what he meant by the words "impulse item" was not that BREW NUTS are purchased with little care, but that they are generally not on a shopper's grocery list. Transcript at 385–86. Second, BREW NUTS and BEER NUTS® are both relatively inexpensive snack foods. Purchasers obviously do not exercise as much care in choosing an inexpensive snack food as they would in choosing an expensive car, computer or an article of clothing. *See Beer Nuts* 711 F.2d at 941. On the other hand, Clover Club presented evidence that fifteen years earlier, in a hidden camera

study of purchasers picking out potato chips and other snack foods, purchasers often exercised great care in deciding which brand to buy. Transcript at 386–88.

None of the evidence on the degree of care likely to be exercised by purchasers is at all conclusive. The court finds, however, that an ordinary purchaser who exercises reasonable prudence in purchasing BREW NUTS would view the entire package front, including the Clover Club® trademark, sufficiently long enough to read the words BREW NUTS, see the picture of the stein, and recognize the Clover Club® trademark. Indeed, a purchaser would be careless to purchase the nuts so quickly that he or she would not see the Clover Club® trademark.

### E. Actual Confusion.

 Although it is not one of the factors specifically identified by the Court of Appeals, the court finds the lack of evidence of actual confusion to be probative. Actual confusion is not an element of trademark infringement; the test is likelihood of confusion. However, "after the lapse of substantial time if no one appears to have been actually deceived that fact is strongly probative of the defense that there is no likelihood of deception arising out of the use of the mark in question." R. Callmann, The Law of Unfair Competition, Trademarks, and Monopolies § 20.06 (1983).

BREW NUTS and BEER NUTS® were marketed in the same area for at least three years. Both companies sold tens of thousands of packages of their nuts in the same area during those three years. Throughout the trial, not a single witness testified that he or she had been confused by the BREW NUTS package. In addition, there was no survey evidence indicating actual confusion (or even a likelihood of confusion). To the contrary, Robert J. Brewster, vice-president of Beer Nuts, Inc., testified that he had no personal knowledge of an instance of actual confusion between BREW NUTS and BEER NUTS®. Transcript at p. 184. The court finds that this

evidence supports the conclusion that confusion about the source of BREW NUTS is unlikely.

### II. CONCLUSION.

 Based on an analysis of the several factors in the Restatement, both individually and collectively, the court finds by a preponderance of the evidence that Clover Clubs' use of its BREW NUTS package does not create a likelihood of confusion about the source of BREW NUTS. That finding is reinforced by the lack of actual confusion during the three years BREW NUTS were marketed in the same area as the plaintiff's product, BEER NUTS®. Accordingly, Clover Club has not infringed Beer Nuts' trademark. Judgment should be entered for the defendant, and the plaintiff's complaint should be dismissed. This opinion constitutes findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.