**SQUIRTCO, Cross-Appellee,**

v.

**The SEVEN–UP COMPANY, a Missouri Corporation and Seven-Up U.S.A., Inc., a Missouri Corporation, Cross-Appellants.**

**Nos. 79–2003, 79–2054.**

United States Court of Appeals, Eighth Circuit.

Submitted April 14, 1980.

Decided Aug. 20, 1980.

---

* Judge GIBSON took senior status on January 1, 1980.

1. The Honorable William C. Hanson, Senior United States District Judge for the Southern District of Iowa.

Edmund C. Rogers (on brief), Rogers, Eilers & Howell, argued, St. Louis, Mo.; John M. Howell and McPherson D. Moore, St. Louis, Mo., on brief, for Seven-Up Co.

Daniel Van Dyke (on brief), Price, Heneveld, Huizenga & Cooper, argued, Grand Rapids, Mich.; Randall G. Litton and Thomas M. McKinley, Grand Rapids, Mich., and Armstrong, Teasdale, Kramer & Vaughan, St. Louis, Mo., on brief, for SquirtCo.

* The Honorable Harold D. Vietor, United States District Judge for the Southern District of Iowa, sitting by designation.

Before STEPHENSON and McMILLIAN, Circuit Judges, and VIETOR,* District Judge.

McMILLIAN, Circuit Judge.

This is an appeal in a trademark action brought by the Squirt Company, which has since changed its name to SquirtCo, against The Seven-Up Company and Seven-Up U.S.A., Inc., over introduction of the QUIRST trademark. Seven-Up appeals from the district court's permanent injunction against its use of QUIRST on a noncarbonated lemonade drink because it infringed on SquirtCo's use of SQUIRT on a carbonated grapefruit drink. SquirtCo cross-appeals from the dismissal of its pendent claim for tortious interference by Seven-Up with contracts between SquirtCo and its franchisees. We affirm the injunction on use of the QUIRST trademark, but we vacate the tortious interference dismissal and remand to the district court with directions to make findings of fact on the tortious interference claim.

SQUIRT was coined as a trademark for soft drinks in 1937, apparently as a reference to the tendency of grapefruit to squirt when eaten with a spoon. It was first registered by SquirtCo in 1939. It has been in continuous use ever since. The trademark QUIRST was coined in late 1977 by an advertising agency hired by Seven-Up to find a name for a new product to "quench thirst."[1] After consumer surveys and trademark availability searches, QUIRST was adopted as the name for the new product on February 15, 1978. On March 24, 1978, SquirtCo learned from one of its franchisees of Seven-Up's plans to introduce the QUIRST trademark and protested orally to Seven-Up on that same day and in writing on March 28, 1978. Seven-Up continued its plan for market entry.

SquirtCo filed the original action on April 7, 1978. In May of 1978, Seven-Up began marketing its QUIRST soft drink. The dis-

1. The intent issue of this case boils down to whether QUIRST is a neologism made up of "quench thirst," as Seven-Up claims, or an anagram of "squirt," as SquirtCo claims.

trict court denied SquirtCo's motion for a preliminary injunction. In response to a motion by both parties, the court separated the issues of liability and damages, and ordered that the trial relate only to the issue of liability.

After a full trial sitting without a jury, the court set out the evidence in great detail and made the following findings, which we summarize here, in its unpublished memorandum opinion:

1. SQUIRT as a trademark is both strong and distinctive.

2. There is a similarity in sound between the SQUIRT and QUIRST marks.

3. The marks are used on highly similar products—non-cola, fruit-flavored soft drinks.

4. The products are in direct competition for the same customers.

5. The evidence, particularly the large advertising budget for market entry, does not indicate that Seven-Up intended to pass off QUIRST soft drink as SQUIRT soft drink.[2]

6. Questioning of purchasers of SQUIRT soft drink and QUIRST soft drink at a grocery store does not prove actual confusion between the SQUIRT and QUIRST marks, especially as the purchasers are not available for cross-examination.[3]

7. Opinion surveys do demonstrate the possibility of confusion between the SQUIRT and QUIRST marks.[4]

8. Consumers exercise a low degree of care in purchasing soft drinks because they

---

**2.** At the time that SquirtCo first objected, Seven-Up had invested relatively little in the QUIRST mark. The investment had risen to over $200,000 at the time of the preliminary hearing and to over $2,000,000 by the end of 1978. By the entry of the permanent injunction, Seven-Up had expanded the product line to include orange, grape and fruit punch as well as lemonade and had expended over $5,000,000.

**3.** Seven-Up commissioned a novel study by Maritz Market Research Services, Inc. (the Maritz Study). The Maritz Study was ostensibly designed to "develop facts" rather than elicit opinions. Therefore, they insist that it was an "investigation" rather than a survey.

The Maritz Study was conducted at grocery stores in Phoenix, after QUIRST soft drink had been on the market in Phoenix, for about six weeks. Persons who had used coupons for non-cola soft drinks were asked to recall, without looking, what brand of soft drink they had purchased.

Of the 98 who said they bought QUIRST soft drink, all 98 had QUIRST soft drink. One who said she bought 7-UP soft drink had QUIRST soft drink, one who said she bought SPRITE soft drink had QUIRST soft drink, and one who said she bought SHASTA soft drink had QUIRST soft drink. Of the 70 who said they bought SQUIRT soft drink, 65 had SQUIRT soft drink, two had SPRITE soft drink, and three had QUIRST soft drink. Two who said they bought 7-UP soft drink had SQUIRT soft drink, and two who said they bought SPRITE soft drink had SQUIRT soft drink.

Seven-Up argues that only those three who said they bought SQUIRT soft drink but had QUIRST soft drink were confused between those two marks. Seven-Up also put on expert testimony that the correct base number was 175, or all the respondents because the confusion ran both ways. Three out of 175 is 1.7%. (Seven-Up points out that on that basis the confusion between SQUIRT soft drink and SPRITE soft drink was 3.1%.) The trial court, however, decided that only those 70 respondents who said they bought SQUIRT soft drink made up the relevant base. Three out of 70 is 4.3%, which is the figure the court used.

On the other hand, SquirtCo argues that the three who said they bought SQUIRT soft drink but had QUIRST soft drink were instances of actual confusion. Not only was the methodology of the study novel, but also the admission of survey-type interviews as evidence of actual confusion was without legal precedent. The trial court refused to treat this as actual confusion but rather as indications of likelihood of confusion. The court was particularly concerned that the three respondents were not available for cross-examination. In short, the court gave the investigation the same weight as an opinion survey.

**4.** SquirtCo commissioned two opinion surveys, which were conventional in methodology and content. Their objective was to determine likelihood of confusion. The surveys were postured as "a study of grocery products" and were based on sound alone, with no visual component. Differences in procedures were dictated by the fact that QUIRST soft drink had been available and promoted in Phoenix, albeit for only six weeks, whereas QUIRST soft drink was not available or promoted in Chicago. SQUIRT soft drink was available in both locations.

In Chicago, the questionnaire was administered at Zayre's department stores. Women 25 and older were interviewed at random as they left the stores. Four radio ads were played to

are low cost and have a short product life after purchase.

The court concluded:

In summary, the presence of the strong and distinct SQUIRT trademark, the extensive similarity between the SQUIRT and QUIRST marks, the close competitive proximity and similarity between the products, the low to moderate degree of care likely to be exercised by purchasers of soft drinks and the Maritz, Chicago and Phoenix surveys, are all signs of a likelihood of confusion. These considerations lead us to the conclusion that the defendants are infringing the plaintiff's SQUIRT trademarks because the name QUIRST is likely to cause confusion, mistake or deception.

Therefore, the court issued a permanent injunction against use of the QUIRST mark by Seven-Up.[5] The court made no findings, however, regarding the tortious interference claim and dismissed that claim in a single sentence. These decisions were expressly made final pursuant to Rule 54(b). The court certified its decisions on liability for immediate appeal pursuant to 28 U.S.C. § 1292(b).[6]

■ Both parties recognize that the district court applied the proper legal standards regarding infringement. The ultimate issue on the infringement claim was whether the recent mark QUIRST so re-

the respondents, one each for SQUIRT soft drink, QUIRST soft drink, LYSOL disinfectant and KRAFT cheese. Then the interviewer elicited the respondents' opinions to the following questions: (1) "Do you think SQUIRT and QUIRST are put out by the same company or by different companies?" and (2) "What makes you think that?" Of 152 interviews in Chicago, 51 respondents (34%) thought SQUIRT soft drink and QUIRST soft drink were put out by the same company, while 84 (55%) thought they were put out by different companies, and 17 (11%) said they didn't know.

In Phoenix, the questionnaire was administered at grocery stores, and the sample was limited to women 25 and older who had purchased soft drinks that day. Because both SQUIRT soft drink and QUIRST soft drink were available, no radio ads were played to establish brand awareness. The same two questions were asked. Of 476 interviews in Phoenix, 110 (23%) thought that SQUIRT soft drink and QUIRST soft drink were put out by the same company, while 161 (34%) thought that they were put out by different companies, and 205 (43%) said they didn't know.

SquirtCo offered the results of the surveys but did not put on expert testimony interpreting those results. Seven-Up's principal attack on the survey was that the first question was dichotomous and therefore encouraged guessing by suggesting that it was improper to answer "I don't know." Second, the phrase "put out by" in the first question was attacked as being ambiguous, because in fact the products had a common bottler in Phoenix. Third, Seven-Up asserted that the sample in the Phoenix survey was not representative because the respondents were not even grocery shoppers or purchasers of any product, much less purchasers of soft drinks. Fourth, Seven-Up pointed out that 11% fewer answered "same company" in Phoenix than in Chicago after only six weeks of availability of QUIRST soft drink in Phoenix,

indicating that QUIRST soft drink was establishing a trademark identity. Fifth, Seven-Up asserted that soft drinks are selected in the marketplace by visual recognition, whereas the survey was based totally on sound. Sixth, Seven-Up cited scholarly, non-legal articles for the proposition that survey evidence requires expert interpretation. And finally, Seven-Up strenuously objected to the court's determination that, based on their answers to the second question, 53 of the Phoenix respondents who said "different companies" nevertheless demonstrated confusion. The court added those 53 to 61 who said "same company" and gave a confused answer to the second question. The result was 114 out of 476, or 25% demonstrating confusion. Seven-Up protested that adding favorable answers to unfavorable answers in order to get a total percentage of confusion was irrational and unprecedented.

**5.** *Squirt Co. v. Seven-Up Co.*, 480 F.Supp. 789 (E.D.Mo.1979).

**6.** Notwithstanding reservation of the damages issue for later determination, this court had jurisdiction under 28 U.S.C. § 1292(a)(1) to review the grant of the injunction and all matters related to it. *Wrist-Rocket Mfg. Co. v. Saunders Archery Co.*, 516 F.2d 846 (8th Cir.), *cert. denied*, 423 U.S. 870, 96 S.Ct. 134, 46 L.Ed.2d 100 (1975). *See American Cyanamid Co. v. Lincoln Laboratories, Inc.*, 403 F.2d 486 (7th Cir. 1968) (comparing the exceptions in § 1292(a)(1) and § 1292(a)(4)). The tortious interference claim had been finally adjudicated within the meaning of 28 U.S.C. § 1291. Although it was not necessary for the trial court to certify the case under 28 U.S.C. § 1292(b), we decline Seven-Up's invitation to view this as the trial court's admission that it was unsure of the result.

sembled the registered mark SQUIRT that its use was "likely to cause confusion, or to cause mistake, or to deceive." The Lanham Trademark Act, 15 U.S.C. §§ 1114(1), 1127. The court recognized that resolution of this issue does not hinge on a single factor but requires a consideration of numerous factors to determine whether under all the circumstances there is a likelihood of confusion. *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 523 F.2d 1331 (2d Cir. 1975). A strong and distinctive trademark is entitled to greater protection than a weak or commonplace one. *See J.B. Williams Co. v. Le Conte Cosmetics, Inc.*, 523 F.2d 187, 192 (9th Cir. 1975), *cert. denied*, 424 U.S. 913, 96 S.Ct. 1110, 47 L.Ed.2d 317 (1976). Similarity is based on an examination of the marks as a whole, including visual impression and sound. *David Sherman Corp. v. Heublein, Inc.*, 340 F.2d 377, 380 (8th Cir. 1965). Where the products are closely related, less similarity in the trademarks is necessary to support a finding of infringement. *Id.* Competitive proximity is one factor to be considered, even though infringement may be found in the absence of direct competition. *HMH Publishing Co. v. Turbyfill*, 330 F.Supp. 830 (M.D.Fla.1971). Intent on the part of the alleged infringer to pass off its goods as the product of another raises an inference of likelihood of confusion, but intent is not an element of a claim for trademark infringement. *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 157–58 (9th Cir.), *cert. denied*, 374 U.S. 830, 83 S.Ct. 1870, 10 L.Ed.2d 1053 (1963). Likewise, actual confusion is not essential to a finding of trademark infringement, although it is positive proof of likelihood of confusion. *Standard Oil Co. v. Standard Oil Co.*, 252 F.2d 65, 74 (10th Cir. 1958). In evaluating survey evidence, technical deficiencies go to the weight to be accorded them, rather than to their admissibility. *La Maur, Inc. v. Revlon, Inc.*, 245 F.Supp. 839, 842 (D.Minn. 1965). In an opinion survey, a response by approximately 25% of the sample that two products were made by the same company was sufficient to support an inference of likelihood of confusion. *E. g., James Bur-*

*rough Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266 (7th Cir. 1976) (15%); *Humble Oil & Refining Co. v. American Oil Co.*, 259 F.Supp. 559 (E.D.Mo.1966), *aff'd*, 405 F.2d 803 (8th Cir.), *cert. denied*, 395 U.S. 905, 89 S.Ct. 1745, 23 L.Ed.2d 218 (1969). "[I]n a trademark infringement action the kind of product, its cost and the conditions of purchase are important factors in considering whether the degree of care exercised by the purchaser can eliminate the likelihood of confusion which would otherwise exist." *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons, supra*, 523 F.2d at 1342.

▬▬ Likelihood of confusion is a finding of fact. *Armstrong Cork Co. v. World Carpets, Inc.*, 597 F.2d 496 (5th Cir.), *cert. denied* 444 U.S. 932, 100 S.Ct. 277, 62 L.Ed.2d 190 (1979). Therefore, we must uphold the trial court's finding of likelihood of confusion unless it is clearly erroneous. *Gemeinde Brau, Inc. v. Amana Society*, 557 F.2d 638, 639 (8th Cir.), *cert. denied*, 434 U.S. 967, 98 S.Ct. 511, 54 L.Ed.2d 454 (1977); Fed.R.Civ.P. 52(a). The facts were open to dispute, and it is quite possible that we would have reached a different conclusion on the infringement issue if this case were before us de novo. There is adequate support in the record, however, for each of the trial court's findings. They are not clearly erroneous. Therefore, we affirm the district court's holding that the introduction of the QUIRST mark infringed on the well-established SQUIRT mark, and we uphold the permanent injunction on Seven-Up's use of the QUIRST mark.

▬▬ Tortious interference is a separate claim that depends on different facts than the infringement claim. Yet the court dismissed the tortious interference claim in a single sentence, without making any findings of fact or conclusions of law on that issue. *Squirt Co. v. Seven-Up Co.*, 480 F.Supp. 789, 790 (E.D.Mo.1979).

In this diversity case we are, of course, applying the substantive law of Missouri. The theory of recovery in the instant case is based upon tortious interference with

contractual or business relations. In order to establish a claim of tortious interference under Missouri law, the following elements must be established:

(1) A contract or a valid business relationship or expectancy (not necessarily a contract);

(2) Defendant's knowledge of the contract or relationship;

(3) Intentional interference by the defendant inducing or causing a breach of the contract or relationship;

(4) The absence of justification; and

(5) Damages resulting from defendant's conduct. (citations omitted).

*Salomon v. Crown Life Insurance Co.*, 536 F.2d 1233, 1238 (8th Cir.), *cert. denied*, 429 U.S. 961, 97 S.Ct. 387, 50 L.Ed.2d 329 (1976).

Both SquirtCo and Seven-Up are in the business of manufacturing soft drink bases, which are prepared according to specification and distributed by independent bottlers or franchisees. SquirtCo and Seven-Up have sixty-six common bottlers, representing in excess of 30% of SquirtCo's domestic business. SquirtCo's contract with its franchisees provides that SquirtCo can terminate an existing franchisee if the franchisee handles any product under a name which, in SquirtCo's opinion, is confusingly similar to the name SQUIRT.[7] Many of the common bottlers were approached by Seven-Up and requested to become QUIRST franchisees. Some apparently did agree to bottle QUIRST soft drink.

 Rule 52(a) provides that, when sitting without a jury, "the court shall find the facts specially and state separately [the] conclusions of law thereon." Fed.R.Civ.P. 52(a). The purpose of Rule 52(a) is to aid the appellate court in its review as well as the trial court in its adjudication. *United States v. Birnbach*, 400 F.2d 378, 382 (8th Cir. 1968). It is an error for the trial court to fail to make findings of fact, even though no requests for such findings were made. *Finney v. Arkansas Board of Cor-*

*rection*, 505 F.2d 194, 212 (8th Cir. 1974). *See International Longshoremen's Ass'n v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 88 S.Ct. 201, 19 L.Ed.2d 236 (1967) (order granting injunction under Rule 65(d)). Failure to make formal findings of fact may be excusable error, however, where the facts are uncontroverted. Merely indicating the factual basis for the ultimate conclusion will suffice in most cases. *United States v. Birnbach, supra*, 400 F.2d at 382. Where the court does not make findings which are sufficient to indicate the factual basis for its ultimate conclusion, the appropriate procedure is to vacate the judgment and remand for such findings. *United States v. Rohm & Haas Co.*, 500 F.2d 167 (5th Cir. 1974), *cert. denied*, 420 U.S. 962, 95 S.Ct. 1352, 43 L.Ed.2d 439 (1975).

 The only element of tortious infringement which could be gleaned from the district court's unpublished memorandum opinion or from its published order is that a valid contract existed between SquirtCo and its franchisees. None of the remaining four elements are mentioned or could even be inferred. Yet the court directed final judgment of dismissal as to that claim. The order, obviously, falls far short of the requirement of Rule 52(a). Therefore, we vacate the final judgment of dismissal on the tortious infringement claim for failure to make findings of fact and conclusions of law, and remand that claim to the district court.

Accordingly, the judgment is affirmed in part and vacated in part and remanded for further findings.

---

7. Although the court found trademark infringement, that finding is not determinative because the contractual language gives SquirtCo discretion to determine similarity and frees it from

the burden of proving similarity under the standards applied in trademark or unfair competition actions. *Frito-Lay, Inc. v. So Good Potato Chip Co.*, 540 F.2d 927, 930 (8th Cir. 1976).