The **BOARD OF TRUSTEES** of the
**UNIVERSITY OF ARKANSAS,**
**Plaintiff**

v.

**PROFESSIONAL THERAPY SERVICES,**
**INC. d/b/a Razorback Sports and Physical**
**Therapy Clinic, Defendant.**

**Civ. No. 94–5100.**

United States District Court,
W.D. Arkansas,
Fayetteville Division.

Jan. 11, 1995.

Jeff A. Bell, Atty. General's Office, Little Rock, AR, Harold J. Evans, Washington, DC, Fred H. Harrison, University of Arkansas, Little Rock, AR, and Arnold P. Lutzker, Cary A. Eure, and Lynn E. Ecklesten, Fish & Richardson, Washington, DC, for plaintiff.

William Jackson Butt, Davis, Cox & Wright, Fayetteville, AR and Ronald P. Kananen, Marks & Murase, Washington, DC, for defendant.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

This is a case in which the Board of Trustees of the University of Arkansas ("the University") has sued the Razorback Sports and Physical Therapy Clinic ("the Clinic") for unauthorized use of the RAZORBACK name and design logo.

The complaint alleges causes of action for (1) trademark infringement under Section 32 of the Lanham Act, 15 U.S.C.A. § 1114(1)(a) (West 1963 and Supp.1994); (2) false designation of origin under Section 43(a) of the Lanham Act, *Id.* § 1125(a); (3) unfair competition under the common law of Arkansas; (4) trademark infringement under the common law of Arkansas; and (5) dilution of mark under Ark.Code Ann. § 4–71–113 (Michie 1991). No jury trial was requested, and the case was originally scheduled for a bench trial.

The parties have now filed cross-motions for summary judgment. The University seeks a partial summary judgment on its federal trademark infringement claim under Section 32 of the Lanham Act, 15 U.S.C.A. § 1114(1)(a) (1963 and West Supp.1994). For its part, the Clinic seeks summary judgment dismissal of all the University's claims.

After full consideration of the cross-motions, plaintiff's motion will be granted, and defendant's motion will be denied.

## I. SUMMARY JUDGMENT STANDARD

Summary judgment is not to be granted unless the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there exists no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Harrison Western Corp. v. Gulf Oil Co.*, 662 F.2d 690, 692 (10th Cir.1981); Fed.R.Civ.P. 56(c).

It is settled doctrine that the fact that both parties have moved for summary judgment does not permit the entry of summary judgment if disputes remain as to material facts. *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431 (10th Cir.1979). However, cross-motions for summary judgment do permit a court to assume that no evidence other than the pleadings and supporting documents offered by the litigants need be considered in order to determine whether a genuine issue of material fact exists in the dispute. *Harrison Western Corp. v. Gulf Oil Co.*, 662 F.2d 690, 692 (10th Cir.1981); *W.A. Taylor & Co. v. Griswold & Bateman Warehouse Co.*, 754 F.Supp. 1260, 1264 (N.D.Ill.1990); *Laborers Int'l Union v. HSA Contractors, Inc.*, 728 F.Supp. 519, 522 (E.D.Wis.1989); *Williams v. Frank*, 702 F.Supp. 14, 16 (D.Mass 1988); *United Nuclear Corp. v. Cannon*, 553 F.Supp. 1220, 1226 (D.R.I.1982).

## II. BACKGROUND

The court will provide a brief summary of the many undisputed facts presented by the parties. Additional facts will be discussed in later portions of the opinion as they become relevant to the court's analysis.

### a. The University's RAZORBACK Marks

The University of Arkansas was founded in 1871. Former Arkansas football coach Hugo Bezdeck is credited with naming the University of Arkansas football team in 1909 when he referred to his players as "a wild band of Razorback hogs." Since then, for most of the 20th Century, the University has identified itself with the "Razorback(s)" mark and a design logo that features a red, running hog. (These marks will be referred to collectively as RAZORBACK marks.)

Prior to the mid–1970's, unauthorized use of collegiate trademarks in the United States was principally by local merchants who used

the marks as an indication of support. Increased television coverage of college athletics led to an enormous boom in the production and sale of goods bearing collegiate marks. By the early and mid–1980's, many colleges and universities began licensing programs to insure control over goods and services bearing collegiate marks. *See University of Pittsburgh v. Champion Prod. Inc.*, 686 F.2d 1040, 1045 (3rd Cir.), *cert. denied*, 459 U.S. 1087, 103 S.Ct. 571, 74 L.Ed.2d 933 (1982).

The University joined this trend in 1988 when it retained Collegiate Licensing Company (CLC) to oversee licensing of the RAZORBACK marks and to monitor and halt unauthorized uses. (CLC represents over 110 colleges and universities). Also in 1988, the University began the process of obtaining federal registration for its marks, and it obtained its first registration in 1989. Since then it has obtained approximately twenty-five registrations for the RAZORBACK marks. Some of these pertain to the marketing of traditional services provided by the University, such as providing college courses and promoting sporting events and musical performances. Most of the registrations pertain to making RAZORBACK souvenir goods such as those typically found in a college bookstore. Others are for a University credit card, advertising directory and yearbook.

To date, the University and CLC have licensed the RAZORBACK marks to about 720 third party users, mainly for manufacture, sale and distribution of Razorback souvenir goods. During the first fiscal quarter of 1994–95, the period immediately following the basketball team's winning the NCAA Division I Championship, the University received over $405,000 in royalties from licensees.

### b. The Clinic

Since its incorporation in 1971, the Clinic has served the Northwest Arkansas region by providing physical therapy services, which are defined under Arkansas law as:

the treatment of a human being by the use of exercise, massage, heat or cold, air, light, water, electricity, or sound for the purpose of correcting or alleviating any physical or mental condition ..., or the performance of tests of neuromuscular function as an aid to the diagnosis or treatment of any human condition....

Ark.Code Ann. § 17–92–102(1) (Michie 1987). Under Arkansas law, physical therapists must be licensed by the Arkansas State Board of Physical Therapy. *Id.* §§ 17–92–301, –303, –304. Furthermore, under Arkansas law, physical therapy services cannot be provided independent of a referral by a licensed physician. *Id.* § 17–92–308(a)(8).

The Clinic now has two locations—one in Rogers and one in Fayetteville. The Fayetteville location is at 2855 Joyce Street, and it is notably located within 100 meters of a nearby University of Arkansas Medical Science Building.

When originally incorporated in 1971, the Clinic was known as the Physical Therapy Clinic. However, in 1989, the Clinic changed its name to the Razorback Sports and Physical Therapy Clinic, when Dean Weber and Dave England became Clinic consultants and limited partners. (Dean Weber is a former Director of Sports Medicine at the University and also an athletic trainer. Dave England is also an athletic trainer at the University.)

The purpose of starting this new venture with University personnel was to start a sports medicine clinic specializing in the treatment of athletic injuries by physical therapy. This venture was prompted by a number of calls that Weber and England had received from high school coaches and recreational athletes concerning treatment of athletic injuries.

When Weber and England joined the Clinic, it issued a press release stating that the "Razorback Sports and Physical Therapy, (formerly Physical Therapy Clinic) ... has recently changed its name to accommodate its affiliation with [its] limited partners."

On August 27, 1991, the Clinic obtained a fictitious name registration with the State of Arkansas as the "Razorback Sports and Physical Therapy Clinic." For a design logo, the Clinic used a red, running Razorback

hog.[1]

Since the name change, the Clinic has used promotional materials to emphasize its relationship with the University. For instance, the Clinic sent out letters to doctors and coaches from September 1989 through at least February 1990, stating that

★ "Dean Weber, ATC, Director of Sports Medicine at the University of Arkansas, and David England, ATC, head Trainer for the Arkansas Razorbacks" were now the Clinic's "new limited partners" and "professional consultants."

★ Todd Bowden, who "served as a student trainer and graduate assistant trainer at the University of Arkansas," had joined the staff.

★ high school athletes deserve the same quality care received by the "Arkansas Razorbacks or Dallas Cowboys."

★ the Clinic would be holding "Saturday Morning Sports Medicine" clinics for coaches, parents and students at which time one of the "Razorback Team Physicians" would be available to speak with them.

(Pl.'s Opp. Def.'s Mot. Summ. J., Exs. 53, 58)

## III. THE LANHAM ACT

In order for the University to establish that the Clinic has infringed on its trademarks, it must prove (a) that the mark at issue is valid; and (b) that defendant's use of the mark is likely to cause confusion. 15 U.S.C.A. § 1114(1)(a).[2]

■ To determine whether a likelihood of confusion exists, the finder of fact must consider all relevant factors, including those mentioned in *SquirtCo v. Seven–Up Co.*, 628 F.2d 1086, 1091 (8th Cir.1980): (1) the strength of the owner's mark; (2) the similarity between the owner's mark and the alleged infringer's mark; (3) the degree to which the products are in competition with one another (which is often referred to as the "competitive proximity" of the products); (4)

the alleged infringer's intent, or lack thereof, to pass off the trademark owner as the source of the goods, or as a sponsor of the goods; (5) incidents of actual confusion; and (6) the degree of care likely to be exercised by potential customers. Each factor must be considered to the extent it is relevant, and no one factor should be given excessive weight at the expense of some other factor. *Calvin Klein Cosmetics Corp. v. Lenox Lab. Inc.*, 815 F.2d 500, 504 (8th Cir.1987). Each factor will now be considered in turn.

### a. Strength of the RAZORBACK Marks

■ The court first considers the strength of the mark. "A strong and distinctive trademark is entitled to greater protection than a weak or commonplace one." *Squirt-Co,* 628 F.2d at 1091.

■ A mark is considered to be a strong one when it effectively identifies the mark owner in the public mind. To determine a mark's strength, the court may consider a number of factors: the inherent distinctiveness of the mark, the existence of federal registrations, the long-term use of the mark by the owner, the extent of public exposure for the mark through advertising, promotion and unsolicited publicity, and the owner's actions to protect its marks through the successful use of cease and desist letters and litigation. *See Gaston's White River Resort v. Rush,* 701 F.Supp. 1431, 8 U.S.P.Q.2d (BNA) 1209, 1213 (W.D.Ark.1988) (Waters, C.J.).

After consideration of each and every factor listed above, the court concludes as a matter of law that the RAZORBACK marks are strong ones, highly deserving of protection.

### i. Arbitrary Marks

■ The first factor to be considered in evaluating the strength of the RAZORBACK marks is their level of inherent distinctiveness. A general rule is that arbitrary marks are inherently distinctive and strong, while

---

1. In response to this litigation, it has since changed its logo to simply a red Razorback hog head. It has also added a disclaimer to its stationary.

2. There is no dispute that the marks are valid, although there is a dispute as to the strength of these marks, which will be discussed later.

descriptive marks are not due any protection at all, unless the mark owner can prove that the mark has acquired secondary meaning.

■ The parties expend a great deal of ink on the question of whether the RAZOR-BACK marks should be classified as "arbitrary" or "descriptive." The court agrees that the use of RAZORBACK marks, in connection with physical therapy or medical services, as well as almost any other good or service one can imagine, is arbitrary. This is true with most collegiate marks. The historical origin of collegiate mascots is usually the subject of much myth and lore, *see e.g.* G. Schultz, *The Bucky Badger Story* (1981). In determining why one mascot was chosen over another, "a page of history is worth a volume of logic". *New York Trust v. Eisner*, 256 U.S. 345, 349, 41 S.Ct. 506, 507, 65 L.Ed. 963 (1921) (Holmes, J.).[3]

At least one court has reached a similar conclusion in similar circumstances. In *University of Ga. Athl. Ass'n v. Laite*, 756 F.2d 1535, 1541 (11th Cir.1985), the infringer sought to manufacture a product called "Battlin' Bulldog Beer." Each can of beer featured the logo of a Georgia Bulldog holding a football in one hand and a beer in the other. The Eleventh Circuit held that,

> we are convinced beyond a shadow of a doubt that the "University of Georgia Bulldog" is not a descriptive mark. In our view, the portrayal of an English bulldog chosen by the university as a symbol for its athletic teams is, at best, "suggestive," if not downright "arbitrary"

*Id.* at 1541.

Although the court has already decided that the RAZORBACK marks are arbitrary, it is necessary to address the Clinic's spirited argument that the University's marks are not arbitrary, but rather geographically descriptive. If the Clinic is correct that the RAZORBACK marks are geographically de-

scriptive, then the marks are unprotected unless they have acquired secondary meaning.

### ii. Geographical Marks

The Clinic vigorously argues that the RA-ZORBACK marks are no longer arbitrary. Rather, the Clinic contends that the marks now describe the geographic region where the University is located.

> A geographical (or geographically descriptive) term is generally understood as one which refers to, or describes, the place of origin of a product or the situs of a business or other kind of organization.

3 Rudolph Callman, *The Law of Unfair Competition, Trademarks and Monopolies,* § 18.15 at 175 (L. Altman ed., 4th ed. 1993) (footnote omitted).

Usually, a geographic mark is the proper name for a geographic entity, such as a nation, state, county, city, municipality, river, lake or the like. For instance, the following are geographic marks: Bank of Texas, Crystal Cave, Falls Motel, Mammoth Cave, San Jose Window Guard, Thruway Motel, etc. However, a few cases do hold that well-known synonyms for geographic places can also be geographic marks.

> Thus, "Quaker City" is clearly a reference to Philadelphia, and "Quaker State" designates Pennsylvania. The word "Keystone," although ordinarily not understood as geographical term, also refers to Pennsylvania. "Old Dominion" is synonymous with Virginia. "Lone Star" symbolizes Texas.

*Callman, supra,* § 18.18 at 190 (footnotes omitted).

According to the Clinic, the term "Razorback" is a geographic term that refers to Arkansas in the way that the term LONE STAR refers to Texas and QUAKER STATE refers to Pennsylvania. *See Quaker*

---

**3.** Apparently, many writers feel that this quote from Justice Holmes describes something very basic about the human condition. At least they quote it enough. A LEXIS search revealed that the quote or some allusion to it has occurred in some 68 law review articles and some 78 federal court opinions. In a recent Supreme Court dissent, Justice Scalia opined that "Justice Holmes' aphorism that 'a page of history is worth a vol-

ume of logic,' ... applies with particular force to our Establishment Clause jurisprudence." *Lee v. Weisman*, — U.S. —, —, 112 S.Ct. 2649, 2679, 120 L.Ed.2d 467 (1992) (Scalia, J., concurring). To this we would add, "Ditto with college mascots!" One wonders how many other arenas of human endeavor this aphorism can be said to apply to with "particular force."

State Oil Ref. Co. v. Steinberg, 325 Pa. 273, 189 A. 473 (1937); *Texas Farm Prod. v. Lone Star Producing*, 144 U.S.P.Q. (BNA) 312, 1964 WL 8156 (E.D.Tex.1964).

To support its assertion that the term "Razorback" is a synonym for Arkansas, the Clinic argues that the term "Razorback" is supposedly used to refer to Arkansas as "The Razorback State." *The World Almanac of the U.S.A.* (Allen Carpenter and Carl Provose, eds. 1993). It also performed a NEXIS search of publications that supposedly revealed that the term "Razorback" has been used in at least 69 publications widely available in the United States to identify persons from Arkansas and to refer to the State of Arkansas. Finally, it notes that there are over one hundred and fifty Arkansas businesses with the word "Razorback" in their trade names.

The evidence submitted by the Clinic is highly dubious and successfully demolished by the University. As the University notes, Arkansas is actually known as the "Land of Opportunity" or the "Natural State." and individuals from Arkansas are called "Arkansans," not "Razorbacks," at least according to the Arkansas Department of Parks and Tourism of the Fayetteville Chamber of Commerce. (Arkansans who attended universities other than the University of Arkansas would certainly be surprised to discover that they are Razorbacks.)

The University also points to an interesting case entitled *In re New Archery Products Corp.*, 218 U.S.P.Q. (BNA) 670 (T.T.A.B. 1983), where the Trademark Trial and Appeal Board specifically investigated the meaning of the term "Razorback" and noted that the term has a number of meanings, "including the famous Razorback hog indigenous to the southwestern United States." Further, the T.T.A.B. found that the "term has a number of derivative meanings, *including most importantly*, the nickname of the highly successful athletic teams of the Uni-

versity of Arkansas ("the Arkansas Razorbacks")." *Id.* at 671 (emphasis supplied). Notably, the board did not mention any geographical use of the term.

The University also successfully debunks the Clinic's NEXIS search that supposedly reveals sixty-nine (69) articles that refer to Arkansans as "Razorbacks" and Arkansas as "the Razorback State."[4] The vast majority of the articles, about 80%, refer or relate to the athletic teams of the University of Arkansas. Approximately fourteen of the articles make non-athletic references, but these are from out-of-state newspapers or news services. However, even these articles do not prove the Clinic's point. The fourteen non-athletic articles include references to "Razorback" hogs or pigs; "Arkansas, home of the Razorbacks" (which could mean either the athletic teams or the animals); "Razorback Drive"; "Razorback stew"; "Razorback Roast"; "Razorback Retailers"; "Razorback Acquisition Corp."; and "Razorback EZ B1." One article in *The Washington Post* does refer to "residents and college alumni from the Razorback State." And one article from *The St. Louis Post–Dispatch*, refers to persons from Arkansas as "Razorbacks" and in a second article, the author uses the term "Razorback buddies" to refer to the author's friends from Arkansas.[5]

From the materials before the court, it is beyond a doubt that the RAZORBACK marks are arbitrary. The court admits the fact that geographic regions often become strongly identified with the universities located there, and local businesses do frequently name themselves using the university marks. This is a natural result of the goodwill that local businesses and communities justifiably feel toward their institutions of higher learning, or more often, "their" athletic teams sponsored by the institution. However, the resultant identification of a geographic region with a collegiate mark never becomes so strong that it negates the primary identifica-

4. The court also ran the NEXIS search to verify the following conclusions.

5. The University also describes a number of its own, less strategically-limited NEXIS searches for the term "razorback," including one for articles published over a sixty day period from Sep-

tember 19, 1994 to November 17, 1994, inclusive. The search yielded 438 references. Three hundred and ninety seven (397), or 90.6%, referred or related to the athletic teams of the University. (Pl.'s Opp. Def.'s Mot. Summ. J., Ex. 61)

tion of the mark with the University, at least not here in Arkansas.

At least one agency has reached a similar conclusion in similar circumstances. In *University Book Store v. Bd of Regents of the Univ. of Wisc. Sys.*, 1994 WL 382583, 1994 TTAB LEXIS 8 at 73 (T.T.A.B. July 19, 1994), the T.T.A.B. expressly held that a collegiate mark, the WISCONSIN BADGER, is not a geographic term, even though it is the state animal, is frequently used in the trade names of local businesses and is sometimes used to refer to people from the state.

[w]hile suggestive of the State of Wisconsin, ... we agree with [the University] that, based upon the undisputed material facts, the mark "WISCONSIN BADGERS" is not primarily geographically descriptive of applicant's goods and services as a matter of law.

*Id.* The board further held that even if a collegiate mark had become geographically descriptive, it still possessed secondary meaning sufficient to warrant protection under the trademark laws. *Id.* at 66.

### iii. Other Indicia of Strength

Now that the court has established as a matter of law that the RAZORBACK marks are arbitrary, distinctive and likely to be strong, the court will consider other indicia of strength, such as plaintiff's presumptively valid federal registrations, long-term use of the marks, extensive public exposure through advertising, promotion and unsolicited publicity, and the owner's actions to protect its marks through the use of cease and desist letters and litigation. *See Gaston's,* 701 F.Supp. at 1434, 8 U.S.P.Q.2d at 1213.

The University of Arkansas owns twenty-five federal registrations for the RAZORBACK marks. It has used the marks for over 80 years. In the last five years alone, it has expended more than $1 million in promoting the marks, and its licensing program earned over $405,000 in the first quarter of fiscal year 1994–95. The University has earned a national and international reputation through its competition in intercollegiate sports, and these activities have resulted in substantial unsolicited publicity in local, regional, and national media, such as television,

radio and print media. For example, it is estimated that 50 million people, including the President of the United States, watched a single game where the Razorbacks won the 1994 basketball championship. The RAZORBACK marks were, of course, in widespread use throughout that competition. Moreover, since the late 1980's, the University has resorted to frequent use of cease and desist letters and opposition and cancellation proceedings before the United States Patent and Trademark Office. The court concludes that the RAZORBACK marks are strong, widely-recognized marks, highly-identifiable to the University.

Before leaving the first *SquirtCo* factor concerning the strength of the mark, the court will address one final argument by the Clinic that the RAZORBACK marks are weak marks and do not deserve a great degree of judicial protection.

### iv. Third Party Use of Marks

The Clinic contends that the RAZORBACK marks are weak marks in the context of this case, because local and state businesses extensively use the RAZORBACK marks in their trade names. The basic idea is that no one thinks the University is the source of a business' goods or services simply because RAZORBACK marks appear in the trade name. *General Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 626–27 (8th Cir.1987) ("evidence of third party usage of similar marks on similar goods is admissible and relevant to show that the mark is relatively weak and entitled to a narrower scope of protection").

The court agrees that extensive third party use of the term "Razorback" and its pictorial equivalent in local business trade names is beyond reasonable controversy. There are over one hundred and forty separate Arkansas telephone listings in which the term "Razorback" has been incorporated in the business or trade name, such as Razorback Lighting, Razorback Marble Mfg. Co., Razorback Cleaning Services, Razorback Fireworks, Razorback Park & Golf Course, Razorback Security, A–1 Razorback Moving, Razorback Short Stop, Razorback Roller Rink. The Secretary of State has even more listings.

As the court noted earlier in this opinion, the use of collegiate marks by local businesses as part of their trade names is an old and venerable tradition, which has been noted in at least two cases. *See Temple Univ. v. Tsokas,* 1989 WL 104823, 1989 U.S. Dist. LEXIS 10682 at 13 (E.D.Pa. September 8, 1989); *Wisconsin,* 1994 WL 382583, 1994 TTAB LEXIS 8 at 41. Still, in at least two categories of cases, collegiate marks are due trademark protection.

First, there are those cases where the collegiate mark is the actual product being sold. *Georgia,* 756 F.2d 1535 (Georgia Bulldog logo on beer cans); *Wisconsin,* 1994 WL 382583, 1994 TTAB LEXIS 8 (Bucky Badger logo on apparel); *Board of Gov. of the Univ. of N.C. v. Helpingstine,* 714 F.Supp. 167 (M.D.N.C.1989) (North Carolina Tar Heel on apparel).

Second, there are those cases where a local business uses a collegiate mark and it: (a) offers goods or services that directly compete with goods and services offered by the University, or (b) offers goods or services that are so related to goods and services offered by the University that the use of collegiate marks implies a common source. *Temple,* 1989 WL 104823 at *7, 1989 U.S.Dist. LEXIS 10682 at 13 (dental clinic and real estate development corporation that used the name Temple); *Cornell Univ. v. Messing Bakeries, Inc.,* 135 N.Y.S.2d 101 (Sup.Ct.1954), *mod. on other grounds,* 285 A.D. 490, 138 N.Y.S.2d 280 (1955), *aff'd,* 309 N.Y. 722, 128 N.E.2d 421 (1955) (bakery goods that used name Cornell); *but cf. Yale Univ. v. Benneson,* 147 Conn. 254, 159 A.2d 169 (1960) (the mark Yale Motor Inn did not suggest a connection with the University).

In listing these two categories of cases where a collegiate mark is due trademark protection, the court is not holding that there may not be other categories of cases. It may be that the University has absolute control over the use of its marks in the trade names of local and state businesses. On the other hand, the extensive tradition of non-competing businesses using collegiate marks may be so ingrained as to be beyond the regulation of the trademark laws. This court need not consider this difficult question, because the court finds it to be undisputed as a matter of law that the Clinic (a) offers services that directly compete with those offered by the University, or (b) offers services that are so related to those offered by the University as to imply a common source. This conclusion will be explained in the next section of the opinion.

Finally, the Clinic argues that, even if it does offer services that compete with the University, at least some of the other businesses that use RAZORBACK marks in their trade names are competitive with the University. Due to this alleged third party use, the Clinic argues that the RAZORBACK marks are weak even when competitive goods and services are being offered, because use of the RAZORBACK marks does not identify the University in the public mind no matter what.

Unfortunately for the Clinic, there is no evidence that other RAZORBACK businesses compete with the University on a widespread basis. Nor is there evidence that such competition is commonly tolerated by the University.[6] Also there is no evidence that such overlap occurs in the medical field, or any other field that has such a strong concern for public reputation. Further, there is no evidence that such overlap occurs with other RAZORBACK businesses where University employees work for that business and advertise their connection with the University. Finally, there is no evidence that such overlap occurs where the infringing trade name and mark was selected to emphasize a connection with the University, as was done in this case.

As a matter of law, this court holds that the RAZORBACK marks are strong and deserving of protection given the undisputed facts of this case.

---

6. The Clinic specifically refers to "Razorback Health and Fitness" as an example of a third party use more closely related to the University's services than the Clinic's. However, Razorback Health and Fitness has changed its name to "TNT Fitness" in response to the University's objection to use of the RAZORBACK mark. (Pl.'s Mot. Summ. J., Ex. A, Aff. of M. Skoch). The University also claims that it does not tolerate competing uses as a matter of policy.

### b.  Competitive Proximity of the Goods

■ The next factor to be considered, and the most crucial one given the facts of this case, is the competitive proximity of the services offered by the Clinic and the University.

The Clinic primarily offers such services as physical therapy, athletic training, occupational therapy, fitness, work injury prevention and treatment and work hardening services.

The University clearly offers such services through its extensive athletic program to its student athletes.  Also, the University offers physical therapy to the public on an in-patient and out-patient basis through its Medical Sciences campus, receiving referrals from throughout the State.  (Pl.'s Opp. Def.'s Mot. Summ. J., Ex. F, Aff. of Gayla A. Hearn, Director of the Physical Therapy Department of the University of Arkansas for Medical Sciences).  The University also provides physical therapy to high school athletes in conjunction with physicians from the Arkansas Children's Hospital and the University. *Id.*

In addition to physical therapy, the University offers athletic training services, as does the Clinic.  In fact, the out-patient component of the University's Area Health Education Center–Northwest (AHEC–NW) offers school and sports physical examination in a building located less than 100 meters from the Clinic.  (Pl.'s Opp. Def.'s Mot. Summ. J., Ex. G, Aff. of Dr. Lee B. Parker, Director of the AHEC–NW).  The AHEC–NW is a division of the University's Medical Sciences campus.

Even if the University and the Clinic do not compete, there is no doubt that they offer related services.  Universities are known for the training of doctors, nurses and medical staff.  In the public mind, and in fact, universities are on the cutting edge of medical technology and procedure, especially in the area of sports medicine, and especially at a university with a sports program as successful as Arkansas.  This observation is borne out by the fact that Dean Weber and Dave England say they received numerous phone calls in their capacity as University trainers from high school coaches and recreational athletes concerning the treatment of athletic injuries.  In fact, these calls were the reason that Weber and England contacted the Clinic to discuss the prospect of starting a for profit sports medicine clinic in the first place.

Although it is undisputed as a matter of law that the University and the Clinic offer competitive services, the actual extent of competition for the same customers is not critical to the outcome of this case.  If the University and the Clinic do actually compete, then the University deserves protection under trademark law so that it does not lose confused customers to the Clinic.  However, preventing the loss of customers is not the only purpose of trademark law.  Trademark law also exists to provide protection to a trademark owner's reputation so that people do not think they are receiving goods and services from the owner, when they are in fact receiving them from the infringer. *See Callman,* at §§ 20.02 through 20.04.  Thus, the fact that the type of services provided by the Clinic are closely related to those provided by the University is a factor strongly weighing in the University's favor.

### c.  Similarity of the Marks

■ The next factor to be considered is the degree of similarity between the University's marks and the Clinic's.  In determining whether two marks are so similar that they could be confused for one another, the court must examine the marks as a whole, although one feature of the mark may be recognized as more significant in creating a commercial impression. *Gaston's,* 701 F.Supp. at 1437, 8 U.S.P.Q.2d at 1214.

■ Defendant's mark is the "Razorback Sports & Physical Therapy Clinic."  The word "Razorback" is clearly the dominant element of the mark, because the words "Sports and Physical Therapy Clinic" describe the type of business and the services offered.  This element is identical to the University's mark.  The dominance of this element is further underscored by the fact that the word "Razorback" in the defendant's trade name is set apart by coloring it red, the University's school color.  The connection to the University is then made even stronger by use of a red, running Razorback hog logo

next to a medical caduceus. The running hog logo has recently been changed to a Razorback hog's head, and that weakens the similarity of the two marks to some extent, but there is no doubt that, as a matter of law, the overall impression of the mark is substantially similar to that created by the RAZORBACK marks.

### d. Intent to Confuse

■ The next factor to be considered is whether the Clinic intended to confuse the public as to its affiliation with the University. Intent on the part of the alleged infringer to pass off its goods as the product of another raises an inference of likelihood of confusion. *SquirtCo,* 628 F.2d at 1091. However, the presence or absence of an intent to confuse is not critical to finding a likelihood of confusion, and it is certainly not critical to the court's analysis in this case. Since the issue of intent is not determinative, the court will simply state that this issue cannot be resolved on summary judgment.

It may be that the Clinic intended to trade on the name and goodwill of the University. In fact, the circumstances and actions outlined above strongly indicate that such was the case. However, it may be that the Clinic just wanted to brag about its quality staff. Additionally, the questions of intent and bad faith are nearly impossible to deal with on summary judgment in any case, and this case is no exception.

### e. Actual Confusion

■ Actual confusion is strong evidence of a likelihood of confusion. *Mutual of Omaha Ins. Co. v. Novak,* 836 F.2d 397, 400 (8th Cir.1987), *cert. denied,* 488 U.S. 933, 109 S.Ct. 326, 102 L.Ed.2d 344 (1988). But plaintiff is not required to produce such evidence to prevail. *Maas & Waldstein Co. v. Am. Paint Corp.,* 288 F.2d 306, 307 (8th Cir.1981). However, if no one appears to have been actually deceived, that fact is probative of the defense that there is no likelihood of deception. *Callman* at § 20.06. The court does not consider there to be any particularly probative evidence of actual confusion offered by either party. The Clinic provided evidence that the Fayetteville medical community is not confused; and the University pro-

vided evidence that its marketing department and licensees were confused. Neither party presents any evidence as to actual confusion by the consumers of the Clinic's services or the public at large.

### f. Degree of Care

■ Assuming that a likelihood of confusion exists, the Clinic can still argue that purchasers of the Clinic's services exercise such a high degree of care in selecting the Clinic's services that "the degree of care exercised by the purchaser can eliminate the likelihood of confusion which would otherwise exist." *SquirtCo,* 628 F.2d at 1091. To determine whether consumers exercise a high degree of care in purchasing a good or service, the courts should look to the kind of product, its cost, and its conditions of purchase. *SquirtCo,* 628 F.2d at 1091.

■ The court notes that the use of a high degree of care by product purchasers is not a very strong defense when the other factors lean strongly toward trademark infringement. *See Grotrian, Helfferich, Schulz v. Steinway & Sons,* 523 F.2d 1331, 1341 (2d Cir.1975) (despite the high price of pianos and the sophistication of purchasers, the likelihood of confusion resulting from other factors could not be eliminated by the degree of care taken in selection).

The University has attempted to prove that the Clinic's patients exercise such a low degree of care that the risk of confusion is quite high. The University argues that the Clinic's services are prescribed by physicians, and members of the general public who use the Clinic's services will simply follow the advice of their doctor. The primary doctor will probably be chosen with a fair degree of care, but his prescriptions will be followed will be reviewed with a much lesser degree of care. Also, advertisements for Clinic services in the Yellow Pages and other materials reach the public at large. Thus, it is quite possible that a person would decide to utilize the Clinic's services, because it is believed that it is part of or connected to the "Razorback Sports" facilities as the name and logo indicate, and then simply go to a doctor to get the prescription.

The Clinic responds that there are no competing services offered by the University, and even if there were such services, the doctors would not be confused as to any affiliation between the Clinic and the University. These arguments are simply irrelevant. Even if there is no direct competition between the Clinic and the University, the University's loss of control over its reputation would be at risk so long as people who receive or hear about the Clinic's services are confused about the source.

However, the Clinic does make a relevant argument that Clinic patients are unlikely to casually undergo costly, medically-significant physical therapy, and are thus likely to exercise a high degree of care as to the source of the services. This degree of care would still not eliminate any likelihood of confusion that might exist, however, because people who only hear about the Clinic's services will exercise absolutely no degree of care in forming their opinions as to the source of the services. Even as to Clinic patients, it is obvious to the court that patients will rely on their doctors to direct them to clinics, and their primary concern will not be whether that clinic is affiliated with the University. It is not to be expected that any further evidence or psychological studies on this point will change the court's mind.

### g. Other Factors

█ The likelihood of confusion is increased by the close physical proximity between the Clinic and the office of the University medical clinic. It is also increased by the presence of University employees at the Clinic, as well as the Clinic's use of promotional materials to emphasize its relationship with the University.

The Clinic argues that a factor against the likelihood of confusion is the fact that Clinic materials now have a disclaimer of any connection with the University. However, this recently adopted disclaimer will not have a strong impact on the court's analysis in this case.

> [M]any courts have held that a disclaimer does not serve to cure an otherwise clear case of likelihood of confusion. Consumer studies indicate that disclaimers are ineffective in curing the customer confusion over similar marks. In fact, in some instances, the use of a disclaimer can serve to aggravate, not alleviate, confusion over brands.

2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 23.15[9] at 23–105 (3d ed. 1993) (footnotes omitted).

### IV. CONCLUSION

The following factual and legal conclusions are undisputed. First, the visual impression created by the dominant elements of the RAZORBACK marks and the Clinic's marks is highly similar. Second, the RAZORBACK marks are strong ones that distinctively identify the University in the public mind. Third, the Clinic's services and the University's are competitive or so closely related as to suggest a common source. And no degree of care on the part of the Clinic customers can remedy any likelihood of confusion that may exist.

These undisputed conclusions demonstrate a likelihood of confusion and a serious risk to the University that it will lose control over its public image as a provider of medical services, if the Clinic continues to use its marks. Also, there is no reasonable expectation that further evidence presented by the Clinic will change the court's mind in respect to the undisputed facts discussed above and the legal results that flow from them, especially since this case is before the court on cross-motions for summary judgment. Summary judgment is therefore granted for the University on the Lanham Act cause of action.[7]

7. Before closing, for purposes of appeal, the court will make brief mention over two issues extensively argued by the parties that simply do not matter to the court's resolution of the cross-motions.

The Razorback Clinic argues that the University did not catch it in the act of infringement fast enough and then failed to sue it fast enough, and that the University is therefore estopped from pursuing this action. This argument is summarily rejected.

The Razorback Clinic ALSO argues that the University gave permission to Weber and England to work at the Razorback Clinic and therefore acquiesced in the name change. This argument is also summarily rejected.

## ORDER

On this 10th day of January 1995, upon consideration of plaintiff's motion for partial summary judgment, the court finds for the reasons set forth in a memorandum opinion of even date, that said motion should be and hereby is granted.

Upon consideration of defendant's motion for summary judgment, the court finds .that said motion should be and hereby is denied in its entirety, because there are genuine issues of material fact in relation to all of plaintiff's claims.

The parties are now required to brief the issue of what relief is due plaintiff and specifically whether a bench trial will be necessary to determine the remedial issue. The following briefing schedule shall be followed:

(a) Plaintiff's brief shall be filed by the close of business on January 23, 1995.

(b) Defendant's brief shall be due by the close of business on February 6, 1995.

IT IS SO ORDERED.