# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-3797

_____

Louis E. Kemp, Superior Seafoods, Inc.,   *
and Quality Finer Foods, Inc.,             *
                                        *
        Plaintiffs-Appellees.      *  Appeal from the United States
                                          *  District Court for the District of
      v.                         *  Minnesota.
                                          *
Bumble Bee Seafoods, Inc.,         *
                                        *
        Defendant-Appellant.      *

_____

Submitted: October 24, 2003
Filed: February 23, 2005

_____

Before BYE, HANSEN, and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

Defendant-Appellant Bumble Bee Seafoods, Inc. ("Bumble Bee") appeals the district court's adverse rulings following a bench trial on the trademark issues of likelihood of confusion and dilution. Because we find that confusion was likely, we reverse and remand for entry of judgment in favor of Bumble Bee.

## I.  Background

Plaintiff-Appellee Louis E. Kemp ("Mr. Kemp") is from a family that had been engaged in the wholesale and retail seafood business since 1930.  In 1985, Mr. Kemp started Kemp Foods, Inc., which made and sold artificial crab products containing surimi, a low-fat, processed fish product.  In 1987, Mr. Kemp sold the seafood business to Oscar Mayer Foods Corporation for $4 million pursuant to a Stock Acquisition Agreement.  Under the Agreement, Mr. Kemp transferred all trademarks used in his business, including KEMP, KEMP'S and KEMP'S & Design to Oscar Mayer.  He further agreed not to use these marks "or any variation thereof" on any products, except as permitted under the Agreement.  Under the Agreement, Mr. Kemp retained the right to "market, sell or otherwise distribute [certain listed products] bearing a composite trademark consisting of the word KEMP or KEMP's and preceded by one or more additional words, the selection of which shall be approved in advance in writing by  [Oscar Mayer]."

About six months after signing the Agreement, an Oscar Mayer executive asked Mr. Kemp for permission to use the name LOUIS KEMP to market surimi products.  Oscar Mayer previously had achieved success with two-word or full-name marks (e.g. Oscar Mayer, Louis Rich).  Mr. Kemp agreed and entered negotiations with Oscar Mayer to amend the Agreement.  Ultimately, the amended Agreement did not contain all of Oscar Mayer's desired terms, namely, express permission to use the term LOUIS KEMP on all products and exclusion of Mr. Kemp from using the term LOUIS KEMP on any food products.  Similarly, the amended Agreement did not contain Mr. Kemp's desired term, namely, the express reservation of a broad right to use the term LOUIS KEMP on products other than surimi.[1]

---

[1]The district court noted that no party had contemplated, much less used, the composite term "LOUIS KEMP" to market surimi-based seafood products or any other food products prior to the proposed use that precipitated renegotiation of the

Under the amended Agreement, Mr. Kemp granted Oscar Mayer the right to use and register the marks LOUIS KEMP and LOUIS KEMP SEAFOOD CO (the "LOUIS KEMP marks") for surimi-based products and other seafood accessory products within the natural zone of expansion. The amended Agreement also included a revised reservation of rights for Mr. Kemp that provided:

> It is agreed that [Mr. Kemp], or any entity in which [he] has an interest, may utilize a composite trademark consisting of the word KEMP or KEMP's and preceded or followed by one or more additional words the selection of which shall be approved in advance in writing by [Oscar Mayer] in connection with the marketing, selling, or distribution of [certain listed products].

In 1992, Oscar Mayer sold the surimi business to Tyson Foods, Inc., who in turn sold the business to Bumble Bee. Con Agra Foods subsequently acquired Bumble Bee. Before October 1995, Bumble Bee and its predecessors spent over $49 million to promote and advertise the LOUIS KEMP marks. By October 1995, the LOUIS KEMP marks had achieved a brand awareness of 47%, Bumble Bee's Louis Kemp Seafood Company held a 77% share of the market for retail pre-packaged seafood and LOUIS KEMP was the number one surimi seafood brand with a 55% market share. It is undisputed that Bumble Bee owns numerous registered trademarks for KEMP, including the term KEMP without restriction as to font, trade dress or form, and more narrow registrations for the term KEMP along with certain design elements. In addition, Bumble Bee owns registration numbers 1,859,815 and 1,859,816 (for the mark LOUIS KEMP) and 1,859,817 and 1,879,931 (for the mark LOUIS KEMP SEAFOOD COMPANY).

In April and May 1995, Mr. Kemp wrote to Jeno F. Paulucci of Luigino's, Inc., a prospective business partner, to propose the formation of a new company "to

Agreement.

-3-

develop and sell a line of precooked wild rice products." Mr. Kemp noted his intention to take advantage of the goodwill associated with the LOUIS KEMP marks (goodwill that Bumble Bee, Tyson, and Oscar Mayer had invested $49 million to develop) when he stated:

> Non-fish products can use the 'Louis Kemp' brand name which has national recognition with over $50 million spent on advertising, 20 million lbs of 'Louis Kemp' product sold annually with a 67% market share of the prepackaged retail market in its category. [April 1995 letter]

> We could use the "Louis Kemp" brand name where we can and want to, to take advantage of the considerable equity it possesses and or any and all other brands the company can utilize, now and in the future to develop any other specialty food items that would meet the compan[y']s goal for growth and success. [May 1995 letter]

While Mr. Kemp expressly stated that he desired to "take advantage of the considerable equity" that the "Louis Kemp" brand name possessed, and while he may have believed that he was entitled to do so under the contract, he also recognized the risk attendant to this appropriation of goodwill. He sought and obtained an opinion letter from counsel in which counsel advised that he could use his name, "Louis Kemp" for precooked wild rice products. In counsel's opinion, these products were sufficiently different from fish products to avoid confusion. Counsel did advise against using the term "Louis Kemp Seafood Company," using type font or script similar to that used by [then] Tyson, and using the marks on products that contained surimi.

Mr. Kemp and his newly formed company, Quality Finer Foods[2] entered a "Custom Packing and Sales Agreement" with Luigino's, Inc. Under the Sales

---

[2]Hereafter, we refer to the plaintiffs collectively as Mr. Kemp.

Agreement, Mr. Kemp granted Luigino's the right to cancel the agreement "if any meaningful action (in the sole discretion of Luigino's attorney) is threatened or commenced against Quality Finer Foods or its owner, Louis Kemp, for trade mark infringement, violation and the like." Apparently, Mr. Paulucci, his attorney, or others at Luigino's also recognized the risk attendant to using the trademark LOUIS KEMP.

In October 1995, Mr. Kemp began commercial use of the mark LOUIS KEMP on wild rice, chicken and wild rice soup, and wild rice with stir fry vegetables. Mr. Kemp did not seek Bumble Bee's approval, as per the amended Agreement, for use of the two-word mark on wild rice products. Mr. Kemp's use was accompanied by trade dress that differed from Bumble Bee's trade dress and did not include the words "Seafood Co." In particular, Bumble Bee displayed its LOUIS KEMP SEAFOOD CO. mark against a blue background and Mr. Kemp displayed the LOUIS KEMP mark against a white and red striped background, using a different font. Mr. Kemp juxtaposed the mark with a scene of lakes and wild rice while Bumble Bee's mark appeared on see-through packages that permitted potential consumers to view the surimi product. Mr. Kemp sought registration of the trademark LOUIS KEMP as applied to precooked wild rice products. The Patent and Trademark Office rejected Mr. Kemp's application based on a finding that Mr. Kemp's mark was confusingly similar to Bumble Bee's mark.

On March 13, 1996, Tyson, then owner of the LOUIS KEMP marks, sent Mr. Kemp a cease and desist letter. Tyson alleged infringement and likelihood of confusion. On March 21, 1996, Mr. Kemp responded by explaining that he believed the amended Agreement permitted his use of the trademark LOUIS KEMP on non-surimi products. Mr. Kemp then filed this suit to seek a declaratory judgment regarding a contractual right to use the trademark LOUIS KEMP. Mr. Kemp also brought tortious interference and unfair competition claims against Tyson and

Bumble Bee.  Tyson and Bumble Bee filed trademark infringement and dilution counterclaims against Mr.Kemp based on federal and Minnesota law.  In 1998, Mr. Kemp stopped selling wild rice products under the LOUIS KEMP mark.

Over the next few years, litigation proceeded on many fronts, including state and bankruptcy courts in California, as well as the United States District Court in Minnesota.  On May 21, 2001, upon stipulation of the parties, the district court below entered an Order Granting Consent Judgment which held that the only remaining issues were the issues of trademark infringement and dilution as set forth in Tyson and Bumble Bee's counterclaims.[3]

---

[3]The Order provided, inter alia:

4.   The parties to this litigation have been involved in a number of related litigations in the federal, state, and bankruptcy courts of State of California, including Kemp v. Oscar Mayer Foods Corp., No BC133535 (Super. Ct. Los. Angeles County); Kemp v. Oscar Mayer Foods Corp., No. B105,876 (Cal. Ct. App. 2d Dist.); In re Kemp, No LA9649617 KM (C.D. Cal. Bankr.); Dye, United States Trustee v. Kemp, No. 97-02974-KM (C.D. Cal. Bankr.); Dye, United States Trustee v. Kemp, No. 98-2344-AHM (C.D. Cal.); and Dye, United States Trustee v. Superior Seafoods, Inc., No. 97-01331-KM (C.D. Cal).

* * *

6.   The California litigations have now been resolved by means of a demurrer and grant of summary judgment in favor of Tyson in the California state trial court (i.e., in No. BC133535 (Super. Ct. Los Angeles County)) coupled with a settlement agreement signed by all of the parties to those litigations and the [parties to] present litigation [other than Bumble Bee Seafoods, Inc.], which settlement has been approved by the California bankruptcy court.

The district court then held a bench trial to resolve the outstanding issues of whether Mr. Kemp's use of the LOUIS KEMP mark infringed or diluted Bumble Bee's trademark rights. The evidence included the trial testimony of Mr. Kemp's former salesman for the wild rice products, Patrick Melby. Mr. Melby claimed that actual confusion existed among brokers. In fact, Mr. Melby testified that these professional buyers "always" asked if there was a connection between the wild rice and surimi companies and that they "always" had to have it explained to them that the two products came from different companies. This evidence was undisputed. The district court, however, discounted this evidence and stated, "The Court does not

7.    Pursuant to the doctrine of res judicata, the Court finds that Tyson owns all right, title, and interest in and to the LOUIS KEMP Marks, and Tyson owns U.S. Trademark Registration Nos. 1,859,815 and 1,859,816 (for the mark LOUIS KEMP) and U.S. Trademark Registration Nos. 1,859,817 and 1,879,931 (for the mark LOUIS KEMP SEAFOOD CO.). Accordingly, the Court hereby grants judgment to Tyson on its claim for declaratory judgment (Am. Ans., Aff. Def. & Ctrcls., Ctrcl. I ¶¶ 32-36).

8.    Tyson's LOUIS KEMP Marks are valid, enforceable, and in full force and effect.

* * *

11.    Accordingly, the only issues remaining in the present litigation are whether the use by Kemp of the trademark LOUIS KEMP or any formative of this mark in connection with rice products, including without limitation "seasoned wild rice, chicken wild rice soup, and wild rice with stir fried vegetables" as well as "southwestern white and wild rice, cooked and seasoned white and wild rice and wild and white rice stir fry" (all as identified by Kemp in response to Tyson's Interrogatory No. 1) infringes and/or dilutes Tyson's rights in the Louis Kemp Marks.

-7-

extract from his testimony the inference or conclusion that confusion among brokers was rampant."

Tyson and Bumble Bee submitted a customer survey that purported to show confusion among relevant consumers. The district court discounted the survey as infirm. The district court noted that the pool of survey participants did not accurately reflect the target market and that problems with the format of the surveyor's questions called into doubt the validity of the survey's results.

Mr. Kemp testified that during the many years that he sold seafood products under the KEMP trademarks, another firm sold dairy products under an identical KEMP trademark with no reports of actual consumer confusion. An executive from Con Agra (the company that owned Bumble Bee) testified that he was not aware of any reports of actual confusion between the LOUIS KEMP seafood products and the third party's dairy products. Also, the evidence showed that Mr. Kemp promoted the sale of his wild rice products as side dishes for fish, and Bumble Bee promoted its surimi products for use with rice.

Finally, during trial, Mr. Kemp again made clear his intention to take advantage of the goodwill and brand equity that Bumble Bee and its predecessors had built in the trademark LOUIS KEMP:

> Q. Well, isn't it a fact that you used the mark LOUIS KEMP on you[r] wild rice products solely to take advantage of the huge investment that Oscar Mayer and Tyson invested in the brand?

> A. Absolutely true and that's because the agreement I made with them and they made with me.

The district court applied the six factor test from Squirtco v. Seven-Up Co., 628 F.2d 1086, 1091 (8th Cir. 1980) (listing the following as factors to consider in

assessing the likelihood of confusion: (1) the strength of the owner's mark; (2) the similarity of the owner's mark and the alleged infringer's mark; (3) the degree to which the products compete with each other; (4) the alleged infringer's intent to "pass off" its goods as those of the trademark owner; (5) incidents of actual confusion; and (6) the type of product, its costs and conditions of purchase (the "Squirtco factors")). The district court noted Mr. Kemp's concession that the first and sixth factors weighed in favor of finding a likelihood of confusion. The district court then analyzed the remaining four factors. In doing so, the district court conducted a side-by-side comparison of the parties' respective products' trade dress; discounted similarities in the marks due to differences in the trade dress; noted the absence of competition between the products; found that Mr. Kemp did not intend consumers to associate his products with Bumble Bee's products; found no evidence of actual confusion; and, ultimately, found that there was neither a likelihood of confusion nor actual dilution. As a result, the district court granted judgment in favor of Mr. Kemp.

## II. Analysis - Likelihood of Confusion

We review application of the Squirtco factors and the ultimate determination of a likelihood of confusion for clear error. Children's Factory, Inc. v. Benee's Toys, Inc., 160 F.3d 489, 493 (8th Cir. 1998); Conagra, Inc. v. George A. Hormel, & Co., 990 F.2d 368, 370-71 (8th Cir. 1993). Reversal under the clear error standard is appropriate in this case because, after reviewing the record, we are "left with the definite and firm conviction that a mistake has been committed." Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985) (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948)).

Mr. Kemp argues that minor differences in trade dress, as previously described, establish that the marks are dissimilar. He argues further that he did not have an intent to misappropriate the goodwill consumers associate with Bumble Bee's mark

and that his receipt of advice from counsel proves this fact. He also argues that the underlying products were not in competition with one another and that there was no evidence of actual confusion. Although he concedes that the first factor (the strength of the mark) and the sixth factor (the type of product, its costs, and conditions of purchase) support a finding that confusion is likely, he argues that, on balance, the Squirtco factors support the conclusion that no confusion is likely.

The factors from Squirtco guide our analysis, but the ultimate determination of whether confusion is likely is not to be mechanically determined through rigid application of the factors. Under Squirtco, no one factor controls, and because the inquiry is inherently case-specific, different factors may be entitled to more weight in different cases. Squirtco, 628 F.2d at 1091 ("[R]esolution of this issue does not hinge on a single factor but requires a consideration of numerous factors to determine whether under all the circumstances there is a likelihood of confusion."). Further, the factors are not entirely separable. For example, it is inappropriate to conduct a side-by-side comparison of the elements of two products' trade dress, as urged by Mr. Kemp, without reference to the senior mark's strength or the market conditions under which likely consumers would see the marks. See, e.g., Wynn Oil Co. v. Thomas, 839 F.2d 1183, 1187 (6th Cir. 1988) ("'[I]t is axiomatic in trademark law that "side-by-side" comparison is not the test.'") (quoting Levi Strauss & Co. v. Blue Bell, Inc., 632 F.2d 817, 822 (9th Cir. 1980)). Rather, our comparison of the similarity between marks and products must occur in a context that recognizes how consumers encounter the products and how carefully consumers are likely to scrutinize the marks. See Homeowner's Group, Inc. v. Home Marketing Specialists, Inc., 931 F.2d 1100, 1109 (6th Cir. 1991) ("Instead, the marks must be viewed in their entirety and in context. [A] court must determine, in the light of what occurs in the marketplace, whether the mark will be confusing to the public when singly presented.") (internal quotations omitted).

Applying the factors in this manner, Mr. Kemp's concession that Bumble Bee's mark is strong means that there must be greater degree of dissimilarity between the senior mark and the offending mark. Compare General Mills, Inc. v. Kellogg Co., 824 F.2d 622, 626 (8th Cir. 1987) ("Determining that a mark is weak means that consumer confusion has been found unlikely because the mark's components are so widely used that the public can easily distinguish slight differences in the marks, even if the goods are related.") with Squirtco, 628 F. 2d at 1091 ("A strong and distinctive trademark is entitled to greater protection than a weak or commonplace one."). Also, a greater level of dissimilarity is required because the products in this case are not priced or sold in a manner that suggests a high level of consumer sophistication or deliberation in the identification of product source. See First National Bank, in Sioux Falls v. First National Bank, South Dakota, 153 F.3d 885, 889-90 (8th Cir. 1998) ("[C]onsumers tend to exercise a relatively high degree of care in selecting banking services. As a result, customers are more likely to notice what, in other contexts, may be relatively minor differences in names."); Astra Pharm. Prods., Inc. v. Beckman Instruments, Inc., 718 F.2d 1201, 1206 (1st Cir. 1983) ("[T]here is always less likelihood of confusion where goods are expensive and purchased after careful consideration."); Electronic Design & Sales, Inc. v. Elec. Data Sys. Corp., 954 F.2d 713, 718 (Fed. Cir. 1992) ("[P]urchaser[] . . . sophistication is important and often dispositive because '[s]ophisticated consumers may be expected to exercise greater care.'") (third bracket in original) (quoting Pignons S.A. de Mecanique de Precision v. Polaroid Corp., 657 F.2d 482, 489 (1st. Cir. 1981)); Squirtco, 628 F.2d at 1091 ("'[T]he kind of product, its cost and the conditions of purchase are important factors in considering whether the degree of care exercised by the purchaser can eliminate the likelihood of confusion which would otherwise exist.'") (quoting Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons, 523 F.2d 1331, 1342 (2d. Cir. 1975)).

As to the second <u>Squirtco</u> factor, then, we reject Mr. Kemp's argument that slight differences in trade dress such as type font, text color, and package art make confusion unlikely. Bumble Bee's mark and Mr. Kemp's mark share a dominant feature—the phrase Louis Kemp. Viewed in reference to the facts that Bumble Bee's mark is strong and likely consumers are not expected to exercise great scrutiny in the purchase of low-price, supermarket items, we must conclude that the second <u>Squirtco</u> factor, similarity of the marks, does not strongly support Mr. Kemp's position.[4]

---

[4]In the appropriate case, minor differences in trade dress may provide a valid basis for finding otherwise identical marks to be distinguishable. In <u>General Mills</u>, 824 F.2d at 627, for example, the court found that the mark "OATMEAL RAISIN CRISP" was not likely to be confused with the mark "APPLE RAISIN CRISP" when both marks were used on similar products. There, the underlying cereal products were closely related to the commonly used descriptive terms in their respective composite trademarks, such that the marks were weak. <u>Id.</u> at 626 (recognizing that the highly descriptive nature of the mark "APPLE RAISIN CRISP" made it a weak mark). Further, both parties used their marks in combination with highly distinctive trade dress, namely, prominently displayed, widely recognized house marks. <u>Id.</u> (describing trade dress that featured prominent displays of the house marks "KELLOGGS" and "GENERAL MILLS").

Similarly in <u>Luigino's, Inc. v. Stouffer Corp.</u>, 170 F.3d 827, 830 (8th Cir. 1999), the court found "LEAN 'N TASTY" not confusingly similar to "LEAN CUISINE," both as applied to pre-packaged meals marketed as healthy or diet meals. In <u>Luigino's</u>, the only common ground between the marks was the descriptive word "LEAN." It would have been inappropriate to extend trademark protection in the term "LEAN CUISINE" so broadly as to prohibit a competitor from employing the descriptive term "LEAN" in combination with other terms as part of a composite mark. Further, the court in <u>Luigino's</u> specifically noted that consumers of specialty health-food or diet items were likely to exercise greater care at the point of purchase such that the conditions of purchase mitigated against a likelihood of confusion. <u>Id.</u> at 831. Finally, as in <u>General Mills</u>, both parties' products used trade dress that employed prominent displays of their respective, well known house marks. <u>Id.</u> at

-12-

Turning to the third factor, the degree of competition, we note that the two products, wild rice products and surimi-based products, were not in direct competition. A showing of direct competition, however, is not required, and the factor, "degree of competition" requires a broader examination of the products' relationship in the market. See 15 U.S.C. § 1125(a)(1)(A) (providing for protection against confusion regarding "origin, sponsorship, or approval"); Mutual of Omaha Ins. Co. v. Novak, 836 F.2d 397, 399 (8th Cir. 1987) (stating that "[i]t is error to assume that trademark law protects against use of a mark only on directly competitive products" and that where "there was little or no direct competition . . . infringement still could be found . . . for confusion, not competition, is the touchstone of trademark infringement."); Squirtco, 628 F.2d at 1091 ("Competitive proximity is one factor to be considered, even though infringement may be found in the absence of direct competition."). Where products are wholly unrelated, this factor weighs against a finding that confusion is likely. Where products are related, however, it is reasonable for consumers to think that the products come from the same source, and confusion, therefore, is more likely. Anheuser-Busch, Inc. v. Balducci Publ'ns, 28 F.3d 769, 774 (8th Cir. 1994) (noting that protection extends "'against use of [plaintiff's] mark on any product or service which would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner'") (quoting J. Thomas McCarthy, Trademarks and Unfair Competition § 24.03 (3d. 1992)).

Here, the record clearly reflects a connection between the two products. Mr. Kemp advocated the marketing of his rice products with fish and Bumble Bee

829. Accordingly, in both of these prior cases, unlike the present case, it was particularly appropriate to emphasize the distinctions in trade dress since the marks were weak, the additional trade dress was distinctive rather than descriptive, and, at least in the case of Luigino's, the consumers were presumed to exercise a high degree of care in their purchases.

promoted its surimi product for use with rice. Mr. Kemp's products were intended as side dishes, likely to be served with meat, fish, or poultry. Because direct competition is not the only aspect of this inquiry (although a showing of direct competition may increase the likelihood of confusion), proper application of this factor requires exploration of the likelihood that consumers would draw a connection between the two products and be confused as to the identities of their respective sources. Here, the products were similarly marketed, similarly priced, and intended for use as compliments to one another. Accordingly, this factor weighs in favor of a finding that confusion was likely.

Turning to the fourth factor, the alleged infringer's intent to pass off his goods as those of the trademark owner, we believe the evidence supports only one permissible view of Mr. Kemp's admission, namely, his desire to cause consumers to associate his brand with that of Bumble Bee. The evidence of this clear intention to appropriate for his own benefit the considerable equity, i.e., the trademark goodwill, of the LOUIS KEMP brand name was undisputed. Further, this intention did not change over time. Rather, Mr. Kemp noted his intent in his solicitation letters to Mr. Paulucci and again testified at trial that his subsequent, actual use of the name was designed to take advantage of the investment Oscar Mayer and Tyson had made in the mark.

Rarely will a junior user admit such an intention. Mr. Kemp apparently did so in this case because he believed contract rights entitled him to use the trademark LOUIS KEMP. His subjective opinions regarding his contract rights, however, in no way diminish the effect of his statement. He openly admitted his intention to market his products to take advantage of the considerable equity of the Oscar Mayer and Tyson investments. The only way to take advantage of this brand equity is to cause consumers to mistakenly believe there is, at a minimum, an association between the sources of the products.

No party contemplated, much less used, a composite term that contained the words "LOUIS KEMP" to market surimi-based seafood products—or any other food products—prior to Oscar Mayer's request that precipitated renegotiation of the Agreement. Accordingly, no party enjoyed trademark rights related to the phrase "LOUIS KEMP" before Oscar Mayer invested and developed its mark in association with its surimi business. There are no claims before the court related to state law rights of publicity nor claims that Mr. Kemp enjoyed celebrity status that would merit protection of his personal name under such laws. Accordingly, when Mr. Kemp referred to "the considerable equity" of the LOUIS KEMP brand name, the only equity to which he could have been referring was the equity built by Bumble Bee's predecessors.

We cannot discount this intent based on the fact that Mr. Kemp believed the contract entitled him to play on the goodwill of Bumble Bee's marks. As noted, the contract conditioned Mr. Kemp's right to use a related mark upon Oscar Mayer's prior approval, which Mr. Kemp did not seek. Further, we cannot discount this intent based on the fact that Mr. Kemp received advice of counsel and slightly modified his presentation of his LOUIS KEMP mark. Discounting a showing of intent based on minor changes in presentation is inappropriate because:

> [f]ew businesspeople are foolhardy enough to be so blatant in their attempt to increase profits. To find trademark infringement only by exact identity and not where the junior user makes some slight modification would be in effect to reward the cunning infringer and punish only the bumbling one.

J. Thomas McCarthy, Trademarks and Unfair Competition § 23.20 (4th ed. 2002) (citations and internal quotations omitted). Clearly, Mr. Kemp attempted to minimize his legal risk. His desire to minimize his legal risk, however, cannot be equated with

a diminution of his desire to "take advantage of the considerable equity" of Bumble Bee's trademark.

It is important to note that intent as a <u>Squirtco</u> factor is relevant not because trademark infringement requires intent, bad faith, or any other *mens rea*. Instead, this <u>Squirtco</u> factor is relevant because it demonstrates *the junior user's true opinion* as to the dispositive issue, namely, whether confusion is likely. Accordingly, it is irrelevant that he may have believed contract rights excused his use.[5] He adopted the mark LOUIS KEMP specifically to take advantage of the "considerable equity" Bumble Bee and its predecessors had built in the mark. He admitted this regarding his prospective intentions in his letter to solicit Mr. Paulucci as a partner, and he admitted this under examination regarding his intentions surrounding his actual use. We believe this evidence permits only one possible conclusion, namely, that Mr. Kemp believed consumers would associate his products with those of the senior user. Accordingly, this factor weighs very strongly in favor of finding that confusion was likely.

Finally, turning to the fifth factor, incidents of actual confusion, we cannot say that the district court committed clear error in discounting the survey. The district court acted well within its broad fact finding authority when it chose to discount the survey evidence. We believe, however, that the undisputed testimony of Mr. Kemp's salesman for the wild rice products, Patrick Melby, that actual confusion existed among sophisticated professional buyers, supports a finding of actual confusion. Such buyers are individuals who make their living purchasing food products like those of Bumble Bee and Mr. Kemp, and they may be presumed to exercise a high standard of care. <u>See, e.g.</u>, <u>Ford Motor Co. v. Summit Motor Prods., Inc.</u>, 930 F.2d

---

[5]As noted previously, the only issue before us is the issue of infringement. Based on the stipulation of the parties and the related California litigation, there is no contractual right to use an infringing mark.

277, 293 (3d. Cir. 1991) ("[P]rofessional buyers, or consumers of very expensive goods, will be held to a higher standard of care."); Oreck Corp. v. U.S. Floor Sys., Inc., 803 F.2d 166, 173-74 (5th Cir. 1986) (finding that buyers for professional and institutional purposes were likely to be informed, deliberative buyers not easily confused as to product source). As such, when even professional buyers are confused, it serves as strong evidence that the average consumer, who exercises less scrutiny, is likely to be confused. See Checkpoint Sys. v. Check Point Software Tech., 269 F.3d 270, 285 (3d. Cir. 2001) ("[P]rofessionals or commercial buyers familiar with the field . . . are sophisticated enough not to be confused by trademarks that are closely similar. That is, it is assumed that such professional buyers are less likely to be confused than the ordinary consumer.") (quoting J. Thomas McCarthy, Trademarks and Unfair Competition, § 23:101 (4th ed. 2000)); see also; Perini Corp. v. Perinie Constr., Inc., 915 F.2d 121, 128 (4th Cir. 1990) ("[I]n a market with extremely sophisticated buyers, the likelihood of consumer confusion cannot be presumed on the basis of the similarity in trade name alone.").

The district court, as the fact-finder in this case, was entitled to discount Mr. Melby's testimony. We do not believe, however, that the district court's opinion contains a finding that Mr. Melby was non-credible. The district court merely found that Mr. Melby's testimony failed to demonstrate that instances of confusion were "rampant." Accordingly, the record contains undisputed testimony that there were instances of actual confusion, even if those instances were not "rampant." When, as here, it is shown by an alleged infringer's own salesman that even sophisticated professional buyers experienced actual confusion, such evidence supports a finding that confusion is likely.

In summary, a balancing of the Squirtco factors support a finding that consumer confusion was likely and Mr. Kemp's use was infringement. Having found infringement due to a likelihood of confusion, and there being no remedies for

dilution separate from the available remedies for infringement, we need not address the issue of dilution. The judgment of the district court is reversed and this case is remanded for determination of an appropriate remedy.

_____