# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 11-2459

_____

Superior Seafoods, Inc.;                     *
Superior Seafoods, L.L.C.,                   *
                                             *
          Appellants,                        *
                                             *     Appeal from the United States
     v.                                      *     District Court for the
                                             *     District of Minnesota.
Hanft Fride, P.A.; John D. Kelly;            *
Mark D. Pilon,                               *        [UNPUBLISHED]
                                             *
          Appellees.                         *

_____

Submitted: February 15, 2012
Filed:  July 16, 2012

_____

Before RILEY, Chief Judge, WOLLMAN, and SMITH, Circuit Judges.

_____

PER CURIAM.

Superior Seafoods, Inc. ("the Corporation") and Superior Seafoods, L.L.C. ("the L.L.C.") appeal the district court's[1] grant of summary judgment to its former legal counsel, Hanft Fride, P.A., John D. Kelly, and Mark D. Pilon (collectively, "Hanft Fride"), on the Corporation's and L.L.C.'s legal-malpractice claim. The Corporation and the L.L.C. allege that Hanft Fride committed legal malpractice by

_____

[1]The Honorable Donovan W. Frank, United States District Judge for the District of Minnesota.

stipulating to a consent judgment in a related action, *Kemp v. Tyson Foods, Inc.*, No. 5:96-CV-00173 (JRT) (RLE) (D. Minn. May 22, 2001) ("*Tyson* action"). Because we conclude (1) that the Corporation is not the real party in interest and (2) that the L.L.C. is a suspended entity that lacks the capacity to maintain this lawsuit, we dismiss the appeal.

## I. *Background*

"The factual and litigation history between the parties is long and complex." *Superior Seafoods, Inc. v. Hanft Fride, P.A.*, Civil No. 05–170 (DWF/FLN), 2011 WL 2197646, at *1 (D. Minn. June 3, 2011) (unpublished). The Corporation and the L.L.C. are companies that Louis Kemp created. Hanft Fride, P.A., is a Minnesota law firm. Kelly is a senior partner at Hanft Fride, and Pilon is an attorney and shareholder at Hanft Fride. Hanft Fride represented the Corporation and Kemp in the *Tyson* action. In May 2001, Kelly signed a stipulation for a consent judgment in the *Tyson* action. The Corporation and the L.L.C. assert that Hanft Fride caused it harm by giving away valuable trademark rights in the stipulated consent judgment. The story begins with Kemp's sale of Kemp Foods, Inc. in 1987.

## A. *1987 Stock Acquisition Agreement and 1989 Amendment*

In 1985, Kemp founded Kemp Foods, Inc. to manufacture and sell surimi, which is an artificial shellfish product. Two years later, Kemp sold 100 percent of the capital stock of Kemp Foods, Inc.—"'a company engaged in the business of processing and marketing surimi[-]based seafood products'"—to Oscar Mayer. *Id*. Oscar Mayer obtained as part of the 1987 Stock Acquisition Agreement the rights to all of the trademarks that Kemp Foods, Inc. used, "including the trademarks KEMP, KEMP'S, and KEMP'S & Design." *Id*. The 1987 Stock Acquisition Agreement also stated that

> Seller [Kemp] agrees that neither Seller [Kemp], nor any entity in which
> Seller [Kemp] has an interest, shall in the future market, sell or

otherwise distribute any product except as provided in Section 7.6 and 7.7 or any other food or beverage product either at wholesale or retail bearing the name KEMP, KEMP'S, KEMP'S & Design or any variation thereof.

In ¶ 7.6 of the 1987 Stock Acquisition Agreement, "Kemp and his related entities agreed to cease all use of the [aforementioned] marks within nine months." *Superior Seafoods*, 2011 WL 2197646, at *1. Paragraph 7.7 authorized "Kemp (and any entity in which he has an interest) . . . to market, sell, or distribute certain identified products under a composite mark that included the KEMP name with" Oscar Mayer's advance written approval. *Id*. Neither the Corporation nor the L.L.C. has ever sought such approval.

In the fall of 1987, Oscar Mayer asked Kemp whether it could rename "Kemp Foods, Inc." as the "Louis Kemp Seafood Company." According to Kemp, an Oscar Mayer executive told him that Oscar Mayer would only use LOUIS KEMP on surimi-based products and that Kemp could use his name for anything else. Kemp maintains that he and Oscar Mayer entered into an oral agreement to this effect.

In 1988, Oscar Mayer started using LOUIS KEMP to sell surimi-based products. In 1989, Oscar Mayer and Kemp amended the 1987 Stock Acquisition Agreement ("1989 Amendment") to allow "Oscar Mayer to use and register the trademarks LOUIS KEMP and LOUIS KEMP SEAFOOD COMPANY (the 'LOUIS KEMP marks') to market 'surimi-based seafood products and such other seafood and fish accessory products within the natural zone of product line expansion.'" *Id*. at *2. The 1989 Amendment additionally stated "that '[e]xcept as hereinabove amended, all other provisions of the [1987 Stock Acquisition Agreement] shall remain in full force and effect.'" *Id*. (alterations in original). Subsequently, Oscar Mayer "registered the LOUIS KEMP mark and continued to develop and market products under the LOUIS KEMP mark." *Id*.

"In 1991, the United States sued Kemp for certain loan guarantees." *Id*. In the course of that litigation, "Kemp purportedly sold several assets to Superior Seafoods, Inc., for $10,000, including '[a]ny rights retained by Seller' under the 1987 Stock Acquisition Agreement." *Id*. (alterations in original). The following year, Kraft Foods ("Kraft"), Oscar Mayer's parent corporation, "sold its surimi-based seafood business and related trademark rights to Tyson Foods, Inc. ('Tyson')." *Id*. Tyson, in turn, sold the business to Bumble Bee Seafoods, Inc. ("Bumble Bee"). Thereafter, ConAgra Foods acquired Bumble Bee and later sold the business to Trident Foods.

B. *California Litigation*

In August 1995, Kemp and the Corporation filed suit in California state court against Oscar Mayer, Kraft, and Tyson. In that case, Kemp and the Corporation asserted that Oscar Mayer and Kraft had breached the terms of the 1987 Stock Acquisition Agreement by assigning to Tyson the LOUIS KEMP marks. They also claimed that Tyson misappropriated the LOUIS KEMP marks and violated Kemp's statutory and common-law rights to use his own name. The California state court granted Tyson's demurrer without leave to amend regarding the aforementioned claims and thereafter dismissed the remaining claims. According to that court, "'the defendants [were] using tradenames/marks, which were sold by Kemp to Oscar Mayer.'" *Id*.

Thereafter, Kemp formed Quality Finer Foods ("Quality"). In October 1995, during the pendency of the California action, Quality started using the LOUIS KEMP mark on wild rice, chicken and wild rice soup, and wild rice with stir fry vegetables. "Mr. Kemp did not seek Bumble Bee's approval, as per the amended Agreement, for use of the two-word mark on wild rice products." *Kemp v. Bumble Bee Seafoods, Inc.*, 398 F.3d 1049, 1051 (8th Cir. 2005).

## C. *Minnesota Litigation*

"On March 13, 1996, Tyson, then owner of the LOUIS KEMP marks, sent Mr. Kemp a cease and desist letter. Tyson alleged infringement and likelihood of confusion." *Id*. at 1052. In response, Kemp argued that "the amended Agreement permitted his use of the trademark LOUIS KEMP on non-surimi products." *Id*. Kemp, the Corporation, and Quality then filed suit in Minnesota state court "seek[ing] a declaratory judgment regarding a contractual right to use the trademark LOUIS KEMP." *Id*. Specifically, they sought a declaration that they had the right to use the "Louis Kemp" name on all products other than surimi and certain accessory products. They also brought claims of tortious interference and unfair competition against Tyson and Bumble Bee. "Tyson removed the case to federal court and asserted counterclaims, including a claim seeking a declaration that it was the owner of all right, title, and interest in the LOUIS KEMP marks for use in connection with food and related products." *Superior Seafoods*, 2011 WL 2197646, at *3.[2]

"In March 1997, . . . Kelly advised Kemp that in light of the state court's grant of a demurrer in the California action, most of Kemp's complaint in the Minnesota action would likely be dismissed and advised Kemp that Superior Seafoods, Inc., would likely end up defending an infringement claim asserted by Tyson." *Id*. at *5. Kelly told Kemp that the California state court "'held that [Kemp] ha[d] no right of recovery from Tyson for its use of [Kemp's] name because Tyson bought the right to do so from Oscar Mayer. [The court] stated that if Oscar Mayer breached [the] contract by purporting to sell those rights, then any remedy [Kemp] ha[d] is money damages from Oscar Mayer.'" *Id*. Kelly and Pilon discussed with Kemp the possibility

---

[2]Kemp filed for bankruptcy in California in November 1996. On May 5, 1998, the federal district court in Minnesota stayed the Minnesota litigation pending resolution of the bankruptcy trustee's fraudulent-transfer claim. *See Kemp v. Tyson Seafood Group, Inc.*, 19 F. Supp. 2d 961, 965–66 (D. Minn. 1998). Following the global settlement of the California bankruptcy and state-court litigation, the district court in Minnesota lifted the stay.

of entering into a consent judgment to narrow the issues in the Minnesota litigation. "Pilon worked with Kemp on numerous revisions of a proposed consent judgment." *Id*. But the parties were unsuccessful in negotiating a consent judgment.

In May 2000, Tyson and Bumble Bee moved to dismiss Kemp, the Corporation, and Quality's claims as precluded or, in the alternative, to enforce a consent judgment that Tyson claimed the parties had reached. In December 2000, prior to the district court's hearing on the parties' various motions, Kemp agreed to the terms of a consent judgment. During the hearing on the various motions, including motions for summary judgment, the district court inquired of Tyson's counsel whether Tyson was seeking the right to use the LOUIS KEMP marks on all food products. Tyson's counsel responded, "'We are not seeking the right to use Loui[s] Kemp on all food products.'" *Id*. Tyson's counsel also suggested that the California judgment and the consent judgment defined the rights.

In March 2001, the district court only granted Tyson's motion for summary judgment on Kemp, the Corporation, and Quality's tortious interference and unfair competition claims. *See Kemp v. Tyson Foods, Inc.*, No. Civ. 96–173 JRT/RLE, 2001 WL 391552, at *7–8 (D. Minn. Mar. 31, 2001) (unpublished). The court denied the motions for summary judgment on the parties' dispute over Kemp, the Corporation, and Quality's purported contractual rights to register and use the LOUIS KEMP marks and Tyson and Bumble Bee's purported right to prevent Kemp, the Corporation, and Quality from using the LOUIS KEMP marks. In denying summary judgment, the court pointed out "that under the parties' contracts, and in particular the 1987 Stock Acquisition Agreement and Amendment No. 1, . . . Tyson and Bumble Bee . . . only acquired a limited right to use and register the LOUIS KEMP marks in connection with surimi-based seafood and related products." *Superior Seafoods*, 2011 WL 2197646, at *6 (citing *Kemp*, 2001 WL 391552, at *5). The court also noted "that Paragraph 7.8 of the Stock Acquisition Agreement 'related solely to defendants' right to use and register the LOUIS KEMP mark for certain specific products' and that it

'says absolutely nothing about plaintiffs' rights to use the LOUIS KEMP mark.'" *Id.* (quoting *Kemp*, 2001 WL 391552, at *5). Additionally, the court explained that its

> "holding that plaintiffs did not acquire an affirmative contractual right akin to rights acquired under a concurrent use agreement means that plaintiffs' use of marks incorporating LOUIS KEMP is subject to defendants' claims that: 1) plaintiffs are contractually barred from using LOUIS KEMP under separate provisions in the 1987 Stock Acquisition Agreement; and/or 2) plaintiffs' use of a similar mark causes consumer confusion under standard trademark infringement analysis."

*Id.* (alterations omitted) (quoting *Kemp*, 2001 WL 391552, at *5 n.8). The district court "required the parties to submit a signed stipulation on the consent judgment for the [c]ourt's signature." *Id.*

Thereafter, "the parties exchanged drafts of a consent judgment." *Id.* On May 3, 2001, Kelly advised Kemp "that the current draft that was presented to him for his signature omitted 'important limiting language' that specified that Tyson's rights to the LOUIS KEMP marks were only for surimi and related products." *Id.* The following day, Kelly informed Kemp of a conversation that Kelly had with one of Tyson's lawyers. According to Kelly, "Tyson's counsel refused to reinstate the surimi limitation because that was conditioned on the signing of a prior stipulation." *Id.* Kelly explained that

> [a]s [Tyson's attorney] points out . . . the registered trademarks are what they are and, as you will recall, they are limited. Moreover, the terms of the Judge's recent Order makes clear what the limitations on Tyson's rights are.
>
> I have discussed this with [Pilon]. The language in the Stipulation that has been presented to us does not effect any expansion of Tyson's limited rights to use the trademarks in question. It is the language that was before us when we had our discussion prior to the motion hearing

that [was] held before Judge Tunheim several months ago. It is the language that I informed the Court we had agreed to. While I might prefer the somewhat more expansive language, I am satisfied that its absence is not material.

*Id*. (second and fourth alterations in original).

"On or around May 16, 2001, Kelly signed the stipulation for the consent judgment." *Id*. at *7. Kelly stated in a cover letter to the district court "that the consent judgment was subject to 'the Court's determination that the 'defendants acquired only a limited right to use and register LOUIS KEMP and LOUIS KEMP SEAFOOD COMPANY in connection with surimi-based seafood and related products.'" *Id*.

On May 22, 2001, the district court signed a "Stipulation and Order Granting Consent Judgment" ("Consent Judgment"). The Consent Judgment does not mention any limitations with regard to the rights that Tyson acquired. It provides "that the only issues remaining were whether the use of the LOUIS KEMP marks on wild rice products infringed or diluted Tyson's rights." *Id*.

The district court held a bench trial on whether "'Kemp's adoption and use of the LOUIS KEMP mark for a line of wild rice products infringes or dilutes defendant's trademark rights in the same name.'" *Id*. (quoting *Kemp*, 2002 WL 31185860, at *5). The court concluded "that Kemp's use of the Louis Kemp name in relation to his line of wild rice products did not infringe or dilute the asserted LOUIS KEMP marks." *Id*. at *8 (citing *Kemp*, 2002 WL 31185860, at *8–9).

### D. *2002 Sales Agreement*

Following entry of the Consent Judgment, on December 2, 2002, the Corporation sold to the L.L.C. "all the rights to own, use, and register the LOUIS KEMP name for all the uses that are listed in Exhibits A and B of this Agreement."[3]

The 2002 sales agreement also stated that the Corporation "acknowledges that it is in litigation with Bumble Bee Seafood/con AGRA Inc. over certain aspects of use

---

[3]Exhibit A provides:

1.      All rights to own, use and register the LOUIS KEMP name for all products that are shelf-stable, including canned, pouched, trayed, jarred, bagged, etc., by any means of processing, retorted, dried, etc., products that can be stored at room temperature for 6 months or more and still be fit for human consumption. The products may be seafood products or any other products other than Surimi Seafood. These products may be sold at retail or wholesale pre-packaged branded.

2.      All retail uses and products sold either refrigerated or frozen, seafood or fish, in pre-packaged units, branded LOUIS KEMP and sold at retail, that require refrigeration not to spoil.

3.      All retail products pre-packaged and sold refrigerated or frozen at retail that are non-seafood or fish products.

Exhibit B also provides:

1.      All uses for the LOUIS KEMP name for restaurants and food service uses, to be used as the name of restaurants or any food selling place, and/or inside the restaurant, for any and all uses, signage, menu, etc.

2.      For all fresh and frozen products sold at wholesale to include seafood, fish, and any other products.

of the LOUIS KEMP name, that litigation now on appeal." "[L]itigation now on appeal" was in reference to *Kemp v. Bumble Bee Seafoods, Inc.*, 398 F.3d 1049 (8th Cir. 2005), in which this court ultimately reversed the district court, holding that Kemp's use of the mark was likely to cause consumer confusion and that Kemp's use of LOUIS KEMP in connection with the wild rice products was infringement. *Kemp*, 398 F.3d at 1058.

The 2002 sales agreement provided that the Corporation would "conclude all litigation necessary and w[ould] remain the party in interest through this litigation." But it also advised that "[a]ll rulings of the Court or settlements reached between the parties *will pass through to SUPERIOR SEAFOOD, L.L.C.* for the fields of use that it has acquired the rights to." (Emphasis added.)

## E. *Legal-Malpractice Claim*

On January 27, 2005, the Corporation and L.L.C. filed suit against Hanft Fride, alleging that Hanft Fride committed legal malpractice by stipulating to the consent judgment in the *Tyson* action.[4] Specifically, they alleged negligence and breach of fiduciary duty.

Hanft Fride moved for summary judgment, and the Corporation and L.L.C. moved for partial summary judgment. The district court granted Hanft Fride's motion

---

[4]"In June 2006, plaintiffs filed a separate action to set aside the May 22, 2001 Consent Judgment, arguing that it was a product of fraud on the court or was entered by mistake." *Superior Seafoods*, 2011 WL 2197646, at *9 n.7 (citing *Superior Seafoods, Inc. v. Tyson Foods, Inc.*, Civ. No. 06–2543, 2009 WL 928330 (D. Minn. March 31, 2009) (unpublished)). The district court granted summary judgment to the defendants—Tyson Foods, Inc. and ConAgra Grocery Products Company, LLC. *Superior Seafoods, Inc.*, 2009 WL 928330, at *1. We affirmed the district court's grant of summary judgment. *Superior Seafoods, Inc. v. Tyson Foods, Inc.*, 620 F.3d 873 (8th Cir. 2010).

for summary judgment and denied the Corporation and L.L.C.'s motion for partial summary judgment.

## F. *Appeal*

The Corporation and L.L.C. appealed to this court. Following oral argument, we requested that the parties "supplement the record regarding the corporate status of Superior Seafoods, L.L.C. and Superior Seafoods, Inc." Additionally, we directed the parties to submit "supplemental briefing on the following issues":

1.  Whether a corporation's "administratively dissolved" status on the Wisconsin Secretary of State website means "dissolved," as used in W.S.A. § 180.1405.

2.  Whether an L.L.C.'s "suspended" status on the California Secretary of State's website means "suspended," as used in Cal. Rev. & Tax Code §§ 23301, 23301.5, and 23775.

3.  Whether Superior Seafoods, Inc. maintains status as a real party in interest given that the 2002 sale agreement between Superior Seafoods, Inc. and Superior Seafoods, L.L.C. provides that "[a]ll rulings of the Court or settlements reached between the parties will pass through to Superior Seafood, L.L.C." (Appellants' App. at 116).

In response to this request, the parties advised the court that the Corporation had been "administratively dissolved" in Wisconsin and that the L.L.C. had its status "suspended" in California. Both parties agree that the Corporation's "administratively dissolved" status on the Wisconsin Secretary of State website is the equivalent of "dissolved" under Wisconsin Statutes Annotated § 180.1405. Additionally, both parties agree that the L.L.C.'s "suspended" status on the California Secretary of State's website means "suspended," as used in California Revenue and Taxation Code §§ 23301 and 2331.5.

The parties disagree, however, as to whether, in light of their respective statuses, the Corporation and the L.L.C. may pursue the present appeal.

## II. *Discussion*
### A. *The Corporation*

The Corporation and L.L.C. argue that the "administratively dissolved" status of the Corporation in Wisconsin does not deprive this court of jurisdiction because "W.S.A. § 180.1405(2) explicitly allows a dissolved corporation to continue as a party in existing litigation and to participate in new litigation." They maintain that the Corporation "retains its corporate existence until it has wound up its affairs" and that "[t]his appeal is part of winding up its affairs." Additionally, the Corporation and L.L.C. assert that the Corporation remains a real party in interest in this legal malpractice case because,

> [w]hen all of the language in the [2002 sales agreement between the Corporation and the L.L.C.] regarding litigation is read together, it is clear that the parties were saying that despite the sale to the L.L.C. of the Louis Kemp name for use and registration for most food products, [the Corporation] retained a specific interest in the proceeds of the litigation and thus remained the real party in interest.

In response, Hanft Fride argues that "[b]ecause [the Corporation] has failed to show that its pursuit of this appeal is necessary to wind up and liquidate its business and affairs, it lacks the authority or capacity to pursue its appeal." Hanft Fride also argues that "[b]ecause [the Corporation] sold and conveyed all rights it claims it had in the LOUIS KEMP name, the very rights supporting the claim for damages in the malpractice action, it no longer has standing to pursue a claim for the loss of those rights."

Assuming, without deciding, that the dissolved Corporation may pursue this appeal in winding up its affairs, we conclude that the Corporation is not the real party

-12-

in interest. "A real party in interest is the person who, under governing substantive law, is entitled to enforce the right asserted." *Cascades Dev. of Minn., LLC v. Nat'l Speciality Ins.*, 675 F.3d 1095, 1098 (8th Cir. 2012) (quotations and citation omitted). "In this diversity case, [both parties agree that] the governing substantive law is the law of Minnesota." *Id.*

The 2002 sale agreement between the Corporation and the L.L.C. provides, in relevant part:

> SUPERIOR SEAFOODS, INC. acknowledges that it is in litigation with Bumble Bee Seafood/con AGRA Inc. over certain aspects of use of the LOUIS KEMP name, that litigation now on appeal. SUPERIOR SEAFOODS, INC. warrants it will conclude all litigation necessary and will remain the party in interest through this litigation. All rulings of the Court or settlements reached between the parties will pass through to SUPERIOR SEAFOODS, L.L.C. for the fields of use that it has acquired the rights to.

We agree with Hanft Fride that because the Corporation sold and conveyed virtually all of the rights that it claimed that it had in the LOUIS KEMP name and recognized that the rulings of the court would "pass through" to the L.L.C., it is not the real party in interest and cannot maintain a cause of action against Hanft Fride for alleged legal malpractice arising from the *Tyson* action.

## B. *The L.L.C.*

Because the Corporation is not the real party in interest, the question becomes whether the L.L.C., which is "suspended" in California, may pursue this appeal. The Corporation and the L.L.C. maintain that the L.L.C.'s suspended status does not deprive this court of jurisdiction because "Kemp is diligently taking the steps necessary to obtain a certificate of revivor."

-13-

In response, Hanft Fride argues that a suspended L.L.C. lacks the authority and capacity to pursue an appeal; therefore, this court should dismiss the appeal. It asserts that the Corporation and the L.L.C. erroneously rely on cases in which a corporation has "been reinstated or revived to good standing before dismissal of the appeal" because, in the present case, the "L.L.C. remains suspended."

> Section 23301[of the California Revenue and Taxation Code] provides, in relevant part, "the corporate powers, rights and privileges of a domestic taxpayer may be suspended" if it does not pay its taxes. *The suspension of the corporate powers, rights, and privileges means a suspended corporation cannot sue or defend a lawsuit while its taxes remain unpaid.* (*Gar–Lo, Inc. v. Prudential Sav. & Loan Assn.* (1974) 41 Cal. App. 3d 242, 244, 116 Cal. Rptr. 389.) *Once a suspended corporation pays its taxes and obtains a certificate of revivor, however, the corporation may be allowed to carry on the litigation.* (*Ibid.*) Its revivor will validate most otherwise invalid prior proceedings in the case. (*Ibid.*) The underlying purpose of this statute is to induce the corporation to pay its taxes. (*Ibid.*)

*Kaufman & Broad Cmtys, Inc. v. Performance Plastering, Inc.*, 29 Cal. Rptr. 3d 33, 36 (Cal. Ct. App. 2006) (emphases added).

"[A] suspended corporation *not shown to have reinstated* lacks the right or capacity to defend an action *or to appeal from an adverse decision*." *Traub Co. v. Coffee Break Serv., Inc.*, 425 P.2d 790, 792 (Cal. 1967) (emphases added).

Here, both parties agree that the L.L.C. is "suspended" within the meaning of §§ 23301 and 23301.5.[5] Although the L.L.C. states that it is attempting to get

---

[5]Section 23301.5 provides:

Except for the purposes of filing an application for exempt status or amending the articles of incorporation as necessary either to perfect that

reinstated, it has failed to show that it has, in fact, been reinstated. Therefore, it "lacks the right or capacity . . . to appeal from an adverse decision." *Id*.

### III. *Conclusion*

Accordingly, we must dismiss the appeal.

_____

application or to set forth a new name, the corporate powers, rights, and privileges of a domestic taxpayer may be suspended, and the exercise of the corporate powers, rights, and privileges of a foreign taxpayer in this state may be forfeited, if a taxpayer fails to file a tax return required by this part.